[No. B008199. Second Dist., Div. Seven. May 30, 1986.]

In re the Marriage of HIROKO U. and JEROME H. FRICK.
JEROME H. FRICK, Appellant, v.
HIROKO U. FRICK, Appellant.

1000

**COUNSEL**

Fain, Kaufman & Young and Harry M. Fain for Appellant Husband.

Marvin M. Mitchelson and Sat Karam Kaur Khalsa for Appellant Wife.

**OPINION**

**JOHNSON, J.**—The appellant and cross-respondent, Jerome Frick, and the respondent and cross-appellant, Hiroko Frick, appeal from the trial court's interlocutory judgment of dissolution of marriage. The parties raise numerous issues in challenging the trial court's determinations concerning property division, spousal support, and attorney's fees.

STATEMENT OF FACTS AND PROCEEDINGS BELOW[1]

Jerome and Hiroko met in the latter part of 1966 at the Mikado Hotel and Restaurant, owned and operated by Jerome and his then wife, Yoko. Hiroko was also married at the time.

Jerome and Hiroko began to date each other in 1967. After they had been seeing each other for about five or six months, Jerome proposed to Hiroko.

---

[1]A detailed discussion of the facts relevant to the issues involved will be presented in addressing each specific contention raised by the parties.

Yoko sued for divorce in 1968. As part of the dissolution proceedings, Jerome acquired Yoko's interest in the Mikado.

Hiroko filed for divorce in August 1968. Hiroko's marriage to her husband was dissolved and settlement entered in May 1971. Jerome and Hiroko were married on November 23, 1971. They separated on January 29, 1982.

Jerome filed for dissolution of marriage and the matter was tried from February 28, 1983, through March 24, 1983.

On July 25, 1983, the trial court filed its statement of decision. This decision provided in relevant part: (1) The real property, buildings, hotel and restaurant located at 12600 Riverside Drive upon which the Mikado operations are located are the sole and separate property of Jerome. There was no oral agreement to transmute to community property either the real property or the hotel and restaurant and liquor license.

(2) Although the business and real estate remained Jerome's separate property, Jerome devoted his full labor to the business. Moreover, Jerome commingled community and separate funds so no separate property funds could be found to be the source of the payments on the real estate after marriage. The real estate increased in value due to inflation while the business increased in value in large part due to Jerome's labor. As such, the court is applying a *Pereira* calculation to the business and a *Marsden* calculation to the real property.

(3) The value of the going business of the hotel and restaurant increased from $131,000 at the time of the marriage to $290,000 at the time of trial. Jerome was entitled to a yield of 7.2 percent on his capital investment and as such his investment should have earned him $99,850 without compounding interest. The community is entitled to the remaining increase in the business—$59,150. However, community living expenses must be subtracted from community income to determine the balance of the community property. Since the expenses exceeded the income, no community property remains.

(4) The business real property was worth $1,150,000 at the time of marriage and was worth $1,850,000 at the time of trial. The separate property interest in the real property is $1,118,720 and $613,120 is the fair market value of the community interest. Jerome is awarded the community interest. No charge against the separate property interest in the real property in favor of the community is required for monies expended for interest and taxes.

(5) A country club membership valued at $25,000 was a community asset with a $23,000 debt attached to it. The asset and debt are awarded to Jerome.

(6) A 1982 Datsun automobile is Hiroko's separate property.

(7) The community property family home, valued at $405,000, is awarded to Hiroko.

(8) Two $5,000 checks which Hiroko gave to Jerome were loans. They were not investments in the business. Hiroko is entitled to receive this money back.

(9) Since Jerome has received community property valued at $647,120 while Hiroko has received community property valued at $426,000, Jerome must make an equalizing payment of $110,560.

(10) Jerome must pay spousal support in the sum of $2,500 per month. This amount shall terminate after two years with the court retaining jurisdiction for another three years.

(11) Jerome shall pay Hiroko $25,000 as his contribution to Hiroko's attorney's fees, experts' fees and costs.

The trial court filed its interlocutory judgment of dissolution of marriage on September 15, 1983.

On September 29, 1983, Jerome filed notice of motion for a new trial. This motion for a new trial was denied.

Jerome filed a notice of appeal on December 7, 1983. Hiroko filed a notice of cross-appeal on December 27, 1983.

DISCUSSION

I. ANALYSIS OF ARGUMENTS RAISED ON APPEAL

A. *The Trial Court Did Not Err When in Computing the Pro Tanto Community and Separate Property Interests in Jerome's Separate Property, the Court Calculated the Parties' Respective Interests Based on the Purchase Price of the Property.*

█ Jerome owned certain real property prior to his marriage to Hiroko which he used to operate the Mikado Hotel and Restaurant. During the marriage he used community property funds to reduce the principal balance of the encumbrance on the real property.[2] █ "Where community funds

---

[2]The issue whether community property funds were used throughout the marriage to pay this loan will be addressed subsequently.

are used to make payments on property purchased by one of the spouses before marriage 'the rule developed through decisions in California gives to the community a pro tanto community property interest in such property in the ratio that the payments on the purchase price with community funds bear to the payments made with separate funds.'" (Citations omitted.) (*In re Marriage of Moore* (1980) 28 Cal.3d 366, 371, 372 [168 Cal.Rptr. 662, 618 P.2d 208]; accord *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 436-437 [181 Cal.Rptr. 910].) Under this formula, one first determines the separate property and community property percentage interest in the property. The separate property percentage interest is determined by crediting the separate property with the down payment and the full amount of the loan on the property less the amount by which the community property payments reduced the principal balance of the loan. This sum is divided by the purchase price. The resulting figure is the separate property percentage share. The community property percentage share is determined by dividing the amount in which community property payments reduced the principal by the purchase price. (*In re Marriage of Moore, supra,* 28 Cal.3d at pp. 373-374.) The separate property interest in the property as valued at the end of marriage is determined by adding all the prenuptial appreciation, the amount of capital appreciation during marriage attributable to the separate funds (determined by multiplying the capital appreciation during marriage by the separate property percentage interest), and the amount of equity paid by separate funds. (*In re Marriage of Marsden, supra,* 130 Cal.App.3d at pp. 437-439.) The community property share in the value of the property is determined by adding the amount of capital appreciation during marriage attributable to community funds to the equity paid by community funds. (*Moore, supra,* at p. 374.)

 The trial court applied the above formula in determining the parties' respective interests in the real property.[3] Jerome contends, however, the trial court erred by calculating the separate and community property per-

---

[3]In particular, the trial court found the purchase price of the property was $708,220. Jerome made a down payment of $118,958. He made loan payments before marriage totaling $162,762 and the property had increased in value to $1,150,000 by the time of marriage, i.e., it appreciated $441,780. The community contributed loan payments during marriage of $308,341. The property interest credited to separate property was $399,879 (down payment plus full amount of the loan minus the community loan payments). The community property percentage interest in the property was 43.54 percent ($308,341 divided by $708,220). The separate property interest was 56.46 percent ($399,879 divided by $708,220). The property increased in value by $700,000 during marriage. The community was entitled to 43.54 percent of that increase or $304,779. Jerome was entitled to 56.46 percent of that increase or $395,220. As such, the community's monetary share in the property at the end of marriage was $613,120 ($308,341 [loan payments] plus $304,779 [appreciation]). Jerome's share in the property was $1,118,720 ($441,780 [premarriage appreciation] plus $395,220 [marriage appreciation] plus $118,958 [down payment] plus $162,762 [premarriage loan payments]).

centage interest based on the purchase price of the property rather than on the fair market value of the property at the time of marriage. Jerome, in essence, seeks not only to be awarded all the premarriage appreciation, but wants that appreciation to be factored in when determining the respective percentage interest in the property. We do not believe this is proper.

Under the formula described above, Jerome indisputably was entitled to all the capital appreciation which accrued prior to marriage. The community until marriage had absolutely no interest in the property and, as such, should not and did not reap any of the benefits of the prenuptial appreciation. The issue is how to divide the appreciation accruing during marriage, i.e., what percentage goes to the separate property interest and what percentage goes to the community property interest. We believe fairness dictates that the separate and community property's respective interest should be based on the ratio of capital contribution to the purchase price. It is this ratio (percentage) which best reflects the parties' respective interests in the property at the time the appreciation at issue is accruing. The community should share in the appreciation that accrues during marriage in the same proportion that its capital contribution bears to the total capital contribution required to own the property outright. This is the method of computation that has historically been followed in this state and we believe it is the appropriate one. To do as Jerome asks would give him *double* credit for premarital appreciation in the value of this property. We see no justification for this approach. Indeed it appears to fail the test of fundamental fairness.[4]

B. *In Calculating the Community Pro Tanto Interest in Jerome's Separate Real Property, the Court Did Not Err by Including in Its Calculation Jerome's Principal Payments Following Incorporation.*

Jerome incorporated the Mikado Hotel and Restaurant in September 1978. In October 1, 1978, Jerome entered into a lease between himself as lessor/landlord and the Mikado as lessee/tenant. The original lease called for payment to Jerome of $9,166 per month. The payments were reduced to $6,666 per month at the end of 1979. He deposited this amount into his personal account. Each month he made trust deed payments on the Mikado to Transamerica out of his personal account. In 1978, these payments were $5,000 per month. By the time of trial, these payments were $5,700 per

---

[4]Jerome cites *Garten v. Garten* (1956) 140 Cal.App.2d 489 [295 P.2d 23] and *Estate of Murphy* (1976) 15 Cal.3d 907 [126 Cal.Rptr. 820, 544 P.2d 956] to support his position. However, we do not believe these cases compel us to reach a counter result. As *Garten* provides "'the rule developed through the decisions in California gives to the community a *pro tanto* community property interest in such property in the ratio that the payments *on the purchase price* with community funds bear to the payments made with separate funds.'" (Citations omitted, second italics added.) *Garten v. Garten, supra,* 140 Cal.App.2d at p. 494.)

month. Jerome contends the payments to Transamerica should not have been credited to the community since they were made contemporaneously or reasonably contemporaneously with his deposit of the monthly rental charge and, as such, the payments were traceable to a separate property source. We disagree.

While it is true, rents which are received from a separate property source are considered separate property (Civ. Code, § 5108), Jerome commingled these funds with community property funds.[5] As Jerome testified, the Mikado Hotels, Inc. has two accounts, a general account and a payroll account. He also has a personal account. The income from the operation of the hotel and the restaurant is first deposited into the general account. He then takes some of the money from this account and puts it into the payroll account to meet his corporate payroll needs. He deposits his salary, community property, into his personal account. It is also into this account that he deposits the rent he receives from the corporation and it is from this account that Jerome makes payments to Transamerica.[6]

 Where funds are paid from a commingled account, the presumption is that the funds are community funds. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 610-611 [122 Cal.Rptr. 79, 536 P.2d 479]; *In re Marriage of Marsden, supra,* 130 Cal.App.3d at p. 441.) In order to overcome this presumption, a party must trace the funds expended to a separate property source. (*Ibid.*) This issue presents a question of fact for the trial court and its finding will be upheld if supported by substantial evidence.

There are essentially two methods for tracing expended funds to a separate property source. The first method, relied upon by Jerome, is direct tracing. When separate funds deposited with community funds continue to be on deposit when the withdrawal is made and it is the intention of the drawer

---

[5]We note this is not the typical case in which separate property is producing rent payments. In the case at bar, Jerome essentially paid himself rent. He was the owner of the corporation which paid the rent and the owner of the land, the recipient of the payments. He thus had complete control over the amount of rent payments that he required. Rent was originally $9,166 per month. He later reduced the rent to $6,666 per month since allegedly the corporation could not afford to pay the higher rate. It was thus very easy for Jerome unilaterally to manipulate that which he received as income payments and that which he received as rents. Thus, although we need not reach the issue because of the commingling in his account, we question whether such rent payments should indeed be treated as Jerome's separate property.

[6]The record is unclear as to what other deposits were made into this account and what other expenditures were made with funds from this account. Although in response to this court's inquiry, Jerome's counsel cited other possible sources of money which Jerome deposited into his personal account, we do not believe the record demonstrates these deposits were indeed made into this account.

We note it is also unclear from the record when Jerome opened his personal account.

to withdraw separate funds specifically, the separate property status of the withdrawn funds is established. Jerome contends he satisfied this test. He received rent payments each month of either $9,166 or $6,666 per month. He paid Transamerica $5,000 or $5,700 per month out of this account. Thus, he concludes, these payments have been traced to a separate property source. However, this testimony is not enough to satisfy the requirements in this context. ■ "[T]he burden of establishing a spouse's separate interest in presumptive community property is not simply that of presenting proof at the time of litigation but also one of keeping adequate records. 'The husband may protect his separate property by not commingling community and separate assets and income. Once he commingles, he assumes the burden of keeping records adequate to establish the balance of community income and expenditures at the time an asset is acquired with commingled property.' (*See* v. *See, supra,* 64 Cal.2d at p. 784 [51 Cal.Rptr. 888, 415 P.2d 776].)" (*Estate of Murphy, supra,* 15 Cal.3d at p. 919.) The exact amount of money allocable to separate property and the exact amount of money allocable to community property must be ascertained before it can be said the money allocable to separate property is not so commingled that all funds in the account are community property. (*Thomasset* v. *Thomasset* (1953) 122 Cal.App.2d 116, 124-125 [264 P.2d 626], disapproved on other grounds in *See* v. *See* (1966) 64 Cal.2d 778, 785-786 [51 Cal.Rptr. 888, 415 P.2d 776]; *Tassi* v. *Tassi* (1958) 160 Cal.App.2d 680, 689 [325 P.2d 872].)

■ In the case at bar, Jerome provided evidence he received a specific amount of separate property income each month which he deposited in a particular personal account. He also made loan payments from this account. However, he made no other showing of the activity that occurred in this account during this month. We are merely provided an isolated portion of the account's activity. For instance, Jerome provided no evidence of what other expenditures were made from this account, the nature of the funds used, and the time in which they were expended. (Compare *In re Marriage of Mix, supra,* 14 Cal.3d at pp. 613-614; See Comment, *The Mix-Hicks Mix: Tracing Troubles Under California's Community Property System* (1979) 26 UCLA L.Rev. 1231, 1244-1245.) We are left in the dark as to the precise status and amount of separate property in Jerome's personal account at the time of these payments. As the court properly found, ". . . petitioner [Jerome] commingled community and separate funds so that no separate property funds could be found to be the source of the payments on the real estate after marriage." Moreover, we are not satisfied Jerome presented sufficient evidence to demonstrate it was his intent to use only separate property funds to make loan payments. As such, Jerome did not meet his burden of tracing the monthly loan payments to his separate property income.

### C. *The Trial Court Did Not Err in Characterizing Jerome's Postseparation Payments on the Loan as Community Payments.*

■ Jerome contends even if the court did not err in crediting the community with some of his principal loan payments following incorporation, the court did err in including the loan payments which occurred after the parties separated. As he argues, all of his earnings which he deposited into the account after the separation was his separate property.

While we recognize post-separation earnings of a spouse are that spouse's separate property. (Civ. Code, § 5118.), the same tracing difficulties discussed above compel us to reject Jerome's contention. Jerome did not present sufficient evidence establishing the amount and nature of the funds in the account during this period and the types of transactions that were made. We do not believe evidence of only an isolated portion of the account's activity is enough to meet the requirements of tracing. Given this limited evidence, we are simply forced to speculate as to state of the account during the postseparation period. We refuse to do this.

Jerome, however, emphasizes the court's finding that no community property income remained by the end of the marriage, i.e., it had been exhausted by family expenses. He argues, given the exhaustion of the community property income, these loan payments must have been from Jerome's separate property resources. There were no community property assets with which to commingle. ■ (See *In re Marriage of Mix, supra,* 14 Cal.3d at p. 612 ["If at the time of the acquisition of the property in dispute, it can be shown that all community income in the commingled account has been exhausted by family expenses, then all funds remaining in the account at the time the property was purchased were necessarily separate funds."].) However, the court made this finding in applying the *Pereira* calculation to determine the community's interest in the hotel and restaurant business. The court concluded the community income from the business was exhausted by the community's living expenses. The court made no finding with respect to the nature of the community's interest in the personal banking account.[7] (See discussion *infra.*)

### D. *The Trial Court Did Not Err When in Applying the Marsden Formula It Did Not Take into Account the Additional Encumbrance on the Property of $92,126.93.*

■ On June 17, 1975, Jerome requested Transamerica to pay delinquent property taxes on his real property for the years 1971 through 1974. These

---

[7]Indeed, when we asked Jerome to provide specific citations to the record reflecting whether by the time of the 1982 separation all community funds in Jerome's personal account had been exhausted, he was unable to do so. We found his attempt to establish this fact by implication and inference to be unsatisfactory.

taxes totaled $92,126.93. He asked that this amount be added to the present amount of the note on the property. Transamerica agreed on the condition that Jerome increase his monthly payments on the note and he accept an increased interest rate. Jerome agreed to these conditions and Transamerica made the payment. Jerome contends the trial court erred in failing to take into account this increased loan balance in assessing the respective separate and community property interest in the property.

While the precise nature of Jerome's contentions remain unclear, we believe he is arguing that the $92,126.93 should have been added to the purchase price of the property when determining the respective percentage contribution. Had it been added, it would have had the effect of lowering the community's percentage contribution and thus the community's entitlement to appreciation during marriage. However, we do not believe the trial court erred in this regard. The loan which Jerome was forced to take out was due to his failure to pay property taxes. Yet, as the courts have established, in applying the formula to determine the respective percentage contribution of the separate and community interest, interest and tax payments are not included. These payments do not contribute to the capital investment and are not considered part of it. (*In re Marriage of Moore, supra,* 28 Cal.3d at p. 372; *In re Marriage of Marsden, supra,* 130 Cal.App.3d at p. 438.) It would be inequitable to take into account this loan for property taxes, in essence penalizing Hiroko, when Hiroko was not given the benefit of any of the property taxes the community actually paid.[8]

We do conclude, however, the court erred in failing to take this debt into account in the overall division of the parties' assets and debts.

As discussed above, this loan was taken out to pay for property taxes due on the property. Since the community has a pro tanto interest in the property of 43.54 percent, that portion of the resulting debt from this loan is community debt. The rest of the loan is separate debt not chargeable to the community.[9] To further complicate matters, however, the payments on the

---

[8]As it is, the community suffered as a result of this additional loan. Undoubtedly the effect of this loan was to increase the amount of each payment which went to pay off the interest on the loan and thus to decrease the amount allocated to reduction of principal. In determining the community's pro tanto interest in the property, only the community's principal payments were taken into account, not payments on interest. Consequently, the community's share of Jerome's property was lower than it would have been had he not paid the back taxes by adding to the existing loan.

[9]We recognize the community's pro tanto interest in the property increased over the course of the marriage. However, we still believe it is appropriate to determine the portion of the loan which is community debt based on the community's pro tanto interest at the end of the marriage. The loan assisted the community in realizing its ultimate interest in the property

loan were made from community property. In essence, community property was used to service a loan which was part community debt and part separate debt. The community is entitled to be reimbursed for that portion of the community property which was used to service Jerome's separate indebtedness. (*In re Marriage of Walter* (1976) 57 Cal.App.3d 802, 806-807 [129 Cal.Rptr. 351]; see *In re Marriage of Epstein* (1979) 24 Cal.3d 76, 89 [154 Cal.Rptr. 413, 592 P.2d 1165]; *Weinberg* v. *Weinberg* (1967) 67 Cal.2d 557, 563-564 [63 Cal.Rptr. 13, 432 P.2d 709].) The matter must be remanded to the trial court to make these calculations.

E. *The Trial Court Did Not Err in Requiring Jerome to Repay Hiroko the Sum of $10,000 Received as a Loan.*

On May 7, 1971, Hiroko wrote Jerome a check for $5,000. The word "loan" was written on the top of the check. Jerome cashed this check. On June 6, 1971, Jerome wrote Hiroko a check for $5,000. On the bottom of the check was written "loan payment borrowed 5-7-71." On November 8, 1971, Hiroko wrote Jerome another check for $5,000, again with "loan" written on the check. Jerome also cashed this check. On November 18, 1971, Jerome wrote Hiroko a check for $5,000 marked loan payment. Hiroko never cashed these checks. She testified when Jerome gave her the first check, he told her not to cash it since he had insufficient funds in his account. She testified when he gave her the second check, he told her not to cash it either. He informed her the $10,000 she loaned him would be her investment in the Mikado and they would be equal partners.

Jerome testified he indeed borrowed $5,000 from Hiroko on two separate occasions. However, he gave her two checks in repayment. He did not ask her not to cash the checks, but later learned she had not cashed these checks when he reconciled his bank account. In the latter part of November 1971, they discussed purchasing a house. He told her since she had not cashed the checks, the $10,000 she loaned him would be used as part of the down payment on the house.

The trial court ruled the two $5,000 checks were loans from Hiroko to Jerome. They were not investments in the business. The court ordered Jerome to repay Hiroko the money.

Jerome challenges the trial court's determination contending the loans were either no longer collectible by reason of the statute of limitations or

---

since the Fricks may have lost the property altogether if their back taxes had not been paid.

We also note the proceeds from the loan were used to pay delinquent property taxes for the years 1971-1974. Jerome and Hiroko were married November 23, 1971. The community should not be responsible for any portion of the debt which was incurred due to delinquent property taxes which arose prior to marriage.

they were impliedly cancelled and extinguished when he and Hiroko purchased their marital residence.

We believe the trial court acted properly in requiring Jerome to repay Hiroko the money. The statute of limitations does not bar the collection of a debt of this nature since the statute of limitations does not run as between a husband and wife during the continuance of the marital relationship. (*Mergenthaler* v. *Mergenthaler* (1945) 69 Cal.App.2d 525, 529 [160 P.2d 121]; 3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 469, pp. 498-499; see also *Linker* v. *Linker* (1970) 28 Colo.App. 131 [470 P.2d 921, 923].) Moreover, even if these loans from Hiroko's separate property constituted a contribution to the acquisition of the spousal household, Hiroko is entitled to be reimbursed for this contribution since the loans by their very nature constituted an agreement between the spouses that the contribution was not intended to be a gift. (*In re Marriage of Lucas* (1980) 27 Cal.3d 808, 814-815 [166 Cal.Rptr. 853, 614 P.2d 285].)[10]

F. *Insufficient Evidence Was Presented to Establish Jerome Gave the Datsun Automobile to Hiroko as a Gift.*

The trial court ordered Jerome to transfer a Datsun automobile to Hiroko, ruling Jerome gave the automobile to Hiroko as a gift.

Jerome testified at trial the Datsun was acquired in 1981 or 1982 and title was put in the corporate name. The parties stipulated it was purchased in the corporate name for tax purposes. In addition, Hiroko had exclusive use of the automobile since its purchase. However, Jerome repeatedly testified he did not give Hiroko the automobile as a gift. Hiroko did not testify otherwise.

In order for there to be a valid gift, in addition to delivery and acceptance, there must be an intention on the part of the donor to make an unconditional gift. (3 Witkin, Summary of Cal. Law (8th ed. 1973) Personal Property, §§ 84-85, pp. 1685-1686.) In the case at bar, no evidence was presented demonstrating it was Jerome's intention to make a gift. Yet, "[i]n determining whether the transfer of separate property of the husband or of community property to the wife constituted a gift to the wife . . ., the intention of the husband is 'the all-important and controlling question.' (cite omitted.)" (*De Boer* v. *De Boer* (1952) 111 Cal.App.2d 500, 505 [244 P.2d 953].) Moreover, it is the burden of the alleged donee to establish that

---

[10]Civil Code section 4800.2, relied upon by Hiroko to reach this same result, was enacted by the Legislature in 1983 to abrogate the *Lucas* rule and cannot be applied retroactively to the case at bar. (*Fabian* v. *Fabian* (1986) 41 Cal.3d 440, 451 [224 Cal.Rptr. 333, 715 P.2d 253].)

a gift was intended. (*Estate of Walsh* (1944) 66 Cal.App.2d 704, 708 [152 P.2d 750].) We do not believe evidence that Hiroko had exclusive use of the automobile from the time of its purchase, without more, was sufficient to establish Jerome's intention to make a gift. This is not a case where the husband placed title to the car in his wife's name. Jerome had a total of seven automobiles either in his name or in the name of his corporation. Given this context, the mere fact Jerome gave Hiroko one of these automobiles for her exclusive use does not establish an intent on Jerome's part to make the automobile a gift.

## II. ANALYSIS OF ARGUMENTS RAISED ON CROSS-APPEAL

A. *The Trial Court's Decision that Oral Transmutation of the Mikado Properties Had Not Been Effected Was Supported by Substantial Evidence.*

 Hiroko contends Jerome orally transmuted the Mikado property into community property and the trial court erred in failing to so find.

 A husband or wife may orally transmute separate property into community property. (*Beam* v. *Bank of America* (1971) 6 Cal.3d 12, 25 [98 Cal.Rptr. 137, 490 P.2d 257].) The finding of a trial court that property is either separate or community in character will be upheld if it is supported by substantial evidence. (*Ibid.*)

 Jerome testified he never told Hiroko they would be equal partners in his restaurant, hotel, or real property. In addition, he testified the two $5,000 checks which he borrowed from her were used as part of the down payment on their residence. It was not Hiroko's investment in the business. Moreover, he testified he never discussed the business with Hiroko's parents or other members of her family and never told them he and his wife were equal partners in the business.

We recognize other evidence was presented in an attempt to establish the opposite conclusion. Hiroko repeatedly testified Jerome told her on several occasions he would make her equal partners in his business and he also explained this to her family members. Moreover, he told her the $10,000 she loaned him would constitute her investment in the hotel and real property. However, it is the province of the trial court to assess credibility of witnesses and resolve conflicts in evidence. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].) In the case at bar, the trial court stated: "The court does not find sufficient, credible evidence to support the previous tentative finding of a partial oral transmutation, and further the court finds the testimony of respondent and her witnesses unpersuasive as to the oral transmutation." Given substantial

evidence supports the trial court's decision, we are compelled to reject Hiroko's argument.

B. *The Trial Court's Valuation of the Hotel and Restaurant Business Was Supported by Substantial Evidence.*

The trial court found the value of the going business of the hotel and restaurant increased from $131,000 at the time of the marriage to $290,000 at the time of the trial. Using a *Pereira* calculation, the court concluded Jerome's capital investment should have earned $99,850. The value of the business over and above this, $59,150, was community income. However, since Jerome supported himself, Hiroko, and her three children from a prior marriage, the court concluded the approximately $6,000 per year of community income ($59,150 divided by 10 years of marriage) was exhausted by family expenses. As such no community property remained in existence.

Hiroko contends the trial court erred in making this determination since the court relied on figures presented by Jerome's expert witnesses and these figures were incomplete. We disagree.

Stein, a certified public account, prepared the appraisal which the trial court relied on in making its determination. He testified as to the documentation he used in reaching the conclusions in his appraisal of the business. The records reviewed included: general ledgers from October 1, 1978, to June 30, 1982; purchase journals from November 1, 1979, to June 30, 1982; general journals from October 1, 1978, to June 30, 1982; corporation tax returns for fiscal years ending June 30, 1979 through 1982; cash receipts 1976 through December 31, 1982; cash disbursements 1976 through December 31, 1982; general journal 1976 through December 31, 1982; general ledger January 1976 through December 31, 1982; statement of revenues and expenses December 31, 1971, 1972, and 1973; and individual income tax returns 1971 through 1981.

Hiroko contends Jerome did not provide certain records, particularly with regard to the pre-1976 period, and without these records the opinions of experts such as Stein, must be deemed speculative and conjectural. However, Stein thoroughly described how he arrived at his conclusion and documented the sources used for reaching this conclusion. While it is true, Stein did make some assumptions due to the lack of certain documentation, the court could properly conclude the assumptions were reasonable. For instance in making the 1971 valuation, financial statements and the proprietorship's books were not available as of December 31, 1971. Thus, an assumption was made that the proprietorship would have had at least two cash banks

of $500 each in order to operate, i.e., Jerome would have had at least $500 in the motel bank and $500 in the restaurant bank. Given this assumption, Stein included $1,000 in cash on the balance sheet. In addition, to determine the accounts receivable for 1971, Stein looked at the accounts receivable for 1976. Since the sales figure for 1971 was $354,764 or 59 percent of the 1976 sales of $600,286, he estimated the accounts receivable on hand in 1971 would reflect this same relationship. As Stein testified, based on experience, receivables will go up almost in direct proportion to one's increase in volume.

In her challenge to the court's determination, Hiroko also raises the difficulty her experts had in obtaining records. Be this as it may, we fail to see how this in any way affects the propriety of the court's reliance on Jerome's experts who were provided more thorough documentation.

Hiroko also contends since Jerome's expert testified as to his opinion solely based on figures provided to him by Jerome, the court should not have adopted the expert's testimony. However, the expert did not testify simply based on what Jerome told him. As discussed above, Jerome provided him substantial documentation. It was from this documentation that the expert reached his conclusions. Moreover, Jerome's testimony concerning his estimate of the value of the business was irrelevant to the conclusions reached by the expert.

Hiroko also challenges the court's conclusion the community income from the business was exhausted by the community's living expenses since Jerome supported himself, Hiroko and her children from a former marriage. We believe the court erred in this regard.

As discussed earlier, the trial court applied the *Pereira* method to apportion the profits of Jerome's business between Jerome and the community. Pursuant to this method, the court allocated a fair return on Jerome's investment in the separate property and allocated the excess profits to the community property. (*Pereira* v. *Pereira* (1909) 156 Cal. 1, 7 [103 P. 488].) The court determined the community was entitled to $59,150. However, the court then determined all the community income was exhausted due to community expenses incurred over the course of the marriage.[11] As such, the community was not entitled to any of the profit from the business. We believe the court erred in this latter respect. During the course of the marriage, Jerome took out of the business whatever income

---

[11]It is presumed the expenses of the family are paid from community funds rather than separate funds. In the absence of contrary evidence, the community earnings are chargeable with these expenses. (*Beam* v. *Bank of America, supra,* 6 Cal.3d at p. 20.)

he needed to meet the expenses of the community, i.e., disbursements from the business covered the community living expenses. These disbursements represented community income since had these disbursements not been made, the value of the corporation would have increased, and under the *Pereira* formula, all of this increased value would have been community property. As such, we are at a loss to understand why the community should be charged with community expenses twice. Community expenses were met with disbursements from the business. These disbursements in fact represented profits from the business which the community would have been entitled to under the *Pereira* formula had they not been withdrawn from the business. A second family expense deduction is unwarranted and unfair to the community. (Bodenheimer, *The Community Without Community Property: The Need for Legislative Attention to Separate-Property Marriages Under Community Property Laws* (1972) 8 Cal. Western L.Rev. 381, 396-403.)[12]

C. *The Trial Court Did Not Err in Failing to Reimburse the Community for the Expenditure of Community Funds on the Improvement of Jerome's Separate Property.*

Before examining the evidence in the case at bar, we must first address the current state of the law in this area. ▪▪▪ Prior to 1975, when the husband used community funds to improve his own separate property, the community was entitled to be reimbursed for this expenditure unless the wife consented to the use of the funds. (*In re Marriage of Jafeman* (1972) 29 Cal.App.3d 244, 256 [105 Cal.Rptr. 483].) This rule was premised on the fact the husband was the manager of the community funds. (*Ibid.*) To permit the husband to improve his separate property with community funds operated as a constructive fraud upon his wife. (*In re Marriage of Warren* (1972) 28 Cal.App.3d 777, 781-782 [104 Cal.Rptr. 860].) The community's right to reimbursement was measured either by the increased value of the property or the amount expended, whichever is greater. (*Id.*, at pp. 782-783.) Beginning in 1975, both spouses were granted equal management and control of the community real and personal property, with limited exceptions. (Civ. Code, §§ 5125 and 5127.) However, we do not believe this change in the law should alter the basic principles discussed above. Indeed, we believe the effect of this change should be to place each spouse in the same position as the husband was before 1975. If either spouse appropriates community funds for his or her own benefit, *without the consent of the other*

---

[12]We recognize the Supreme Court in *Beam* v. *Bank of America, supra*, 6 Cal.3d at p. 21 stated that after a court ascertains the amount of community income under the *Pereira* approach, it deducts the community's living expenses from community income to determine the balance of community property. However, this aspect of the court's decision was dicta, and as such, not binding on this court.

*spouse,* the community should be reimbursed. Even if in theory both spouses have an equal right to management and control, if one spouse acts in his or her self-interest to the detriment of the community interest, the community should be entitled to restitution.

In the case at bar, Jerome exercised management and control over the community assets and made numerous expenditures on his hotel and restaurant business in the nature of building improvements, furniture, and fixtures. *However,* Hiroko has been unable to point to any evidence in the record which supports the contention Jerome used community funds to make these expenditures.[13] As such, the community is not entitled to be reimbursed for these expenditures.[14]

D. *Sufficient Evidence Established Jerome Was Indebted to DiGiuseppe for the Golf Club Membership.*

As was established at trial, in November 1979, Jerome became a member of the Lakeside Country Club. He paid $23,400 for the membership. To pay this fee, he borrowed the money from James DiGiuseppe, a friend and retired judge. Jerome gave the judge a promissory note for the amount borrowed. The judge also testified to the above. The original check was introduced as was the promissory note. The note had not been paid back as of the time of trial.

The above testimony and documentary evidence constituted substantial evidence supporting the trial court's decision in finding Jerome was indebted to DiGiuseppe in the above amount.

Hiroko contends, however, it was established at trial DiGiuseppe enjoyed a number of "perks" as a result of his relationship with Jerome including the use of a Cadillac and free meals and drinks at his restaurant. Hiroko contends the relationship establishes the loan was either not genuine or it had been repaid through the "perks." However, the judge testified he had

---

[13]At the request of the court, Hiroko's counsel was asked to provide the court *with specific citations to the record* reflecting whether community funds were expended to improve the Mikado. In response counsel stated, "Jerome had complete management and control of community funds, all of the separate funds belonging to Hiroko that he was able to exact from her for the benefit of the business, and of the business itself." We assume counsel understood what was meant by "specific citations to the record" and interpret his lack of citations to be an indirect way of saying there is no evidence in the record reflecting that community funds were so expended.

[14]Hiroko also contends the court erred in failing to take into account interest and taxes paid with community funds in determining the value of the community interest in the real property. However, since payments for interest and taxes do not contribute to the capital investment, they are excluded from the calculation of the respective separate and community interests. (*In re Marriage of Moore, supra,* 28 Cal.3d at pp. 372-373.)

been receiving these "perks" even before he retired as a judge. He retired from the bench approximately in 1977. As such, the trial court could properly conclude the receipt of "perks" had no bearing on the loan. In any event, both Jerome and the judge testified it was a valid loan. It is not our role to reweigh the credibility of this testimony.

E. *In Its Award of Spousal Support to Hiroko, the Trial Court Erred in Automatically Divesting Itself of Jurisdiction After Five Years.*

The trial court ordered Jerome to pay Hiroko spousal support in the amount of $2,500 per month. The court stated this support shall terminate in two years with jurisdiction being retained for another three years. After that date, jurisdiction was to terminate completely. We believe the court erred in automatically terminating jurisdiction.

Orders providing for absolute termination of spousal support are disfavored. (*In re Marriage of Vomacka* (1984) 36 Cal.3d 459, 467 [204 Cal.Rptr. 568, 683 P.2d 248].) "A trial court should not terminate jurisdiction to extend a future support order after a lengthy marriage, unless the record clearly indicates that the supported spouse will be able to adequately meet his or her financial needs at the time selected for termination of jurisdiction. In making its decision concerning the retention of jurisdiction, the court must rely only on the evidence in the record . . . . If the record does not contain evidence of the supported spouse's ability to meet his or her future needs, the court should not 'burn its bridges' and fail to retain jurisdiction." (*In re Marriage of Morrison* (1978) 20 Cal.3d 437, 453 [143 Cal.Rptr. 139, 573 P.2d 41]; accord *In re Marriage of Vomacka, supra,* 36 Cal.3d 459, 467-468.) The burden is on the party seeking to terminate spousal support to show that the other spouse's needs will be adequately met at the time of termination. (*Ibid.*)

In the case at bar, the court found Hiroko to be a person of above average intelligence and good health with a fluency in two languages— English and Japanese. In addition, Hiroko was leaving the marriage with substantial assets including $130,560 in cash. The court also concluded Hiroko could find work if she wanted to. Even in light of these findings, however, we do not believe the trial court's decision was justified. At the time of the court's ruling, Hiroko was 49 years old and not currently employed. While it is true a vocational expert testified Hiroko was employable, the fact remained that Hiroko did not then have a job. As such, it was little more than speculation whether Hiroko would indeed be able to find a job or how much that job would pay. Furthermore, while the assets Hiroko received were significant, they were not inexhaustible. Moreover, the retention of jurisdiction by the court would not have increased the burden

on Jerome. Indeed, in two years, Hiroko's support payments will cease, barring a subsequent finding she requires more time to find employment at an adequate salary. However, there is no reason for the court to terminate its jurisdiction to deal with unforeseen eventualities affecting Hiroko's ability to support herself. Thus, it is improper for the court to "burn its bridges." (See *In re Marriage of Smith* (1978) 79 Cal.App.3d 725, 738-739 [145 Cal.Rptr. 205] [trial court erred in ordering spousal support automatically terminated after five years even though wife had some employable skills and was attempting to obtain a degree in business administration. Whether she would indeed obtain employment was speculation. The retention of jurisdiction would not burden husband and spousal support could always be terminated in the future].[15])

 We recognize a trial court can modify or terminate spousal support when the spouse does not make a good faith effort to obtain employment. (See *In re Marriage of Morrison, supra,* 20 Cal.3d at p. 453; *In re Marriage of Sheridan* (1983) 140 Cal.App.3d 742, 749 [189 Cal.Rptr. 622].) We also note Hiroko testified she had no desire to seek employment. However, we still believe the trial court acted prematurely in automatically terminating jurisdiction over spousal support since obviously at the time of the order, no accurate assessment could be made of Hiroko's future efforts to find employment. We trust, however, Hiroko is now aware that she must seek employment in good faith.

F. *The Trial Court's Award of Attorney's Fees to Hiroko Was Adequate.*

 The decisions whether and in what amount to award attorney's fees and costs are within the broad discretion of the trial court. The court's decision will not be reversed on appeal unless a clear showing of abuse of discretion is made. (*In re Marriage of Behrens* (1982) 137 Cal.App.3d 562, 575 [187 Cal.Rptr. 200].) The trial court ordered Jerome to pay Hiroko $25,000 as his contribution to her attorney's fees, experts' fees and costs. Hiroko's attorney had presented evidence demonstrating fees in the present action were $104,000 at the end of trial and prior to Jerome's motion for a new trial. Hiroko contends the trial court erred in only awarding the amount it did. However, we conclude the court did not abuse its discretion in making this award.

In the case at bar, critical to the trial court's decision to award Hiroko only $25,000, was its determination Hiroko had lied a great deal throughout

---

[15]We note we have found no post *Morrison* case in which a court's decision to automatically terminate jurisdiction at some future date has been upheld. This is not to say that no such case is imaginable. But it does suggest a very high burden must be met before such termination is affirmed.

the course of the case. The court held much of Hiroko's fees and costs were generated due to these fabrications. It is certainly not this court's role to reassess the propriety of this factual determination. Moreover, given the court's conclusion, we agree Jerome should not be forced to bear that portion of Hiroko's attorney's fees attributable to her own bad faith in pursuing certain phases of the action. (See *Smith* v. *Smith* (1970) 4 Cal.App.3d 446, 452 [84 Cal.Rptr. 241] [trial court did not abuse its discretion in failing to award the plaintiff the full amount of her attorney's fee request since the plaintiff failed to disclose relevant facts concerning the issue of paternity in bad faith and such disclosure would have considerably decreased the length of the litigation]; see also *In re Marriage of Behrens, supra,* 137 Cal.App.3d at p. 576.)

## DISPOSITION

The judgment is reversed and remanded for consideration consistent with this opinion as to the trial court's treatment of the Datsun automobile, the community's entitlement to income from the hotel and restaurant business, the community share of the debt for the property tax loan, and the divestment of jurisdiction over spousal support. In all other respects, the judgment is affirmed. Parties to pay their own costs on appeal.

Lillie, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied June 24, 1986, and the petition of appellant Husband for review by the Supreme Court was denied August 28, 1986.