Filed 3/26/14  Marriage of  McGhie CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re Marriage of LYDIA V. and ROLAND W. MCGHIE. | B247083 |
| LYDIA V. MCGHIE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROLAND W. MCGHIE,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. BD528876)<br><br>**ORDERING MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br>[No Change in Judgment] |

GOOD CAUSE appearing, the opinion filed March 4, 2014, in the above-entitled matter is hereby modified as follows:

1. On page 7, add the following sentence to the end of the third paragraph:

"In an original or modification proceeding, where there are no children, and a party has or acquires a separate estate, including income from employment, sufficient for the party's proper support, no support shall be ordered or continued against the other party." (Fam. Code, § 4322.)

2. On page 8, add the following language at the end of the first paragraph:

Neither *In re Marriage of Terry* (2000) 80 Cal.App.4th 921 nor Family Code section 4322 compels a different result. In *Terry*, the court held that trial courts "should look to the estate as a whole, including the actual and reasonable income potential from investments assets, as well as their total value, in resolving the issue of the estate's sufficiency for proper support." (*Terry* at p. 930.) It did not hold that the supported spouse's principal residence was an investment asset which, under *Kuppinger*, it is not. Section 4322 simply does not address the composition of a "separate estate" and therefore provides no support for husband's position.

[End of Modification]

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____

RUBIN, ACTING P. J.           FLIER, J.           KUSSMAN, J.*

_____

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re Marriage of LYDIA V. and ROLAND W. MCGHIE. | B247083 |
| LYDIA V. MCGHIE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ROLAND W. MCGHIE,<br><br>        Defendant and Appellant. | (Los Angeles County<br>Super. Ct. No. BD528876) |

        APPEAL from an order of the Superior Court of Los Angeles County.  Hank M. Goldberg, Judge; Scott M. Gordon, Judge.  Affirmed.


        Robert D. McGhie for Defendant and Appellant.


        No appearance by Respondent.

_____

This marital dissolution case is before us for a second time. In December 2011, we affirmed an order awarding respondent Lydia V. McGhie (wife) pendent lite spousal support of $1,605 per month. (Case No. B230385.) In this case, appellant Roland W. McGhie (husband) appeals from the judgment awarding wife permanent monthly spousal support of $716 and characterizing certain property as community property. Husband contends: (1) wife was not entitled to spousal support; (2) a car awarded to wife was husband's separate property; and (3) all of the household goods and furniture awarded to wife were husband's separate property. Wife did not filed a Respondent's Brief. We affirm.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

When husband and wife were married on June 1, 1974, each had adult children from prior marriages. They had no children together. About a year after they were married, husband retired from his job at the Department of Water and Power with a pension. Wife continued working in a family business. In 1981, husband and wife executed a post-nuptial agreement. In 1983, wife purchased a home in Glendale with her separate property (the Glenoaks house); wife paid all expenses associated with the Glenoaks house, including property taxes, insurance and maintenance, with her separate property. Meanwhile, the couple lived in a home husband built in Paradise, California (the Paradise house) and their living expenses were paid out of husband's monthly pension. When husband and wife moved into the Glenoaks house in 1987 or 1988, husband rented out the Paradise home and later sold it. In March 2008, husband and wife purchased a Mercury Sable automobile (the Sable) for $24,538.80, which they registered in the names of "McGhie, Lydia and McGhie, Roland." That was the same year the marriage began having difficulties. When they separated on June 14, 2010, husband was 94 years old, wife was 89 years old.

---

[1] Wife's respondent's brief was due on October 26, 2013. She passed away on December 26, 2013.

The matter was set for trial on March 12, 2012. According to their respective income and expense declaration, by January 2012 husband's average monthly income was $6,269.12 and his monthly expenses were $5,804. Wife's average monthly income in February 2012 was $1,284.38 and her monthly expenses were $3,156. Wife sought monthly spousal support of $1,200.

## A.    *The Trial*

In his trial brief, husband argued wife was not entitled to spousal support because she could obtain a "reverse mortgage" on the Glenoaks house, which wife valued at about $550,000. Husband further argued that wife should pay him spousal support so that he could obtain accommodations equivalent to those he enjoyed while living in the Glenoaks house. Regarding the household goods and furniture, including the Sable, husband argued that during the marriage, the community had insufficient funds to pay the community's expenses. As a result, husband paid the community's expenses from his separate property. Therefore, husband maintained, everything purchased with funds from the couple's joint accounts was husband's separate property.

### 1.    Wife's Trial Testimony

Before she purchased the Glenoaks house, wife owned a house in Eagle Rock, "free and clear." Wife was living with husband in the house he built in Paradise, California, when she used the proceeds of the sale of her Eagle Rock house to purchase the Glenoaks house, which has three bedrooms, three and one-half bathrooms and a one bedroom, one bathroom guest house. Wife's older son moved into the Glenoaks house and lived there until husband became ill and the couple moved into the Glenoaks house so that husband could be closer to his doctors. Wife continued to pay all of the expenses associated with the Glenoaks house from her separate property, including taxes, insurance and major repairs. When they separated in 2010, husband and wife had lived together in the Glenoaks house for 22 years.

3

During most of the marriage, wife's only sources of income were her social security and a little dividend income. Husband's pension provided him with a substantial income from which the couple's daily living expenses were paid.[2] Husband and wife maintained a joint checking account. Most of the money in that account came from husband's pension but wife also deposited some of her own money into the joint account. When there was a surplus of money in the joint account, they would purchase a Certificate of Deposit (CD). Husband told wife that when she needed cash, she should get it from his dresser drawer. When wife discovered that husband kept a loaded gun on top of his cash, she decided it was demeaning to have to beg for cash when she was providing husband an expense free home. Instead of taking cash from the dresser, wife cashed checks from the couple's joint checking account and used the money to pay the cleaning lady and for other incidentals, such as her hairdresser. To avoid arguments with husband, wife sometimes used her separate property to pay community expenses. Wife never took money from the joint account and put it in her separate account. Wife could not recall the source of various deposits into her separate account in 2010; she speculated that they might have been from accrued dividends.

When husband and wife entered into the post-nuptial agreement, they each owned an automobile. In 2008, they purchased the Sable with community funds; wife could not recall whether any of her separate property went toward the purchase price. Wife recalled that part of the purchase price came from a CD owned by husband but which was payable to wife on husband's death. Husband subsequently gave wife several documents which stated his testamentary intent vis a vis the Sable and the couple's other car, a Toyota. On June 26, 2008, husband gave wife a document which states: "Ron will get Toyota, Lydia will get Sable." (Trial Exh. 6.) On December 6, 2009, husband gave wife a document, which states that he paid cash for the Sable in 2007; he purchased the Toyota

---

[2]     Husband concedes that, because he retired after they were married, a fraction of his pension (4.776%) was community property. Based on husband's numbers, the community's interest in husband's $5,610.96 monthly pension was $268 (5610.96 x .04776 = 267.9794496).

4

for about the same amount, also with cash; the Toyota was in husband's name; he put the Sable in wife's name "so she will give it to one of her family." (Trial Exh. 7.) Trial Exhibit 11 is a document which states: "This letter to be added to my WILL" and "Sable was a gift from me to Lydia for Christmas." When they separated in June 2010, wife was driving the Sable and husband was driving the Toyota.

### 2.    Husband's Trial Testimony

Husband loaned wife between $25,000 and $50,000 to purchase the Glenoaks house; he did not know whether wife ever paid him back. Husband estimated that it would cost between $2,500 and $3,000 per month to rent a place to live equivalent to the Glenoaks house.

During the marriage, husband put his $4,400 pension check into their joint checking account every month; wife did not put anything into the joint account. Husband never authorized wife to take money out of the joint account and put it into her separate account.

Husband bought a new car every two years and gave the old car to a family member. Before they were married, wife owned a Volvo; after they got married, wife gave the Volvo to her sister "because I was buying cars from thereon." When he purchased the Toyota, husband put it in both his and wife's names. When he decided to give the Toyota to one of his sons, he asked wife to take her name off of it. Husband purchased the Sable with cash from the couple's joint checking account and put title in both their names. Wife later transferred the Sable into her own name, without husband's knowledge. Husband did not dispute that he gave wife the letters dated June 26, 2008 and December 30, 2009, regarding the Sable, but had since changed his mind.

In addition to the Sable, husband had other personal property still at the Glenoaks house, which he wanted awarded to him as his separate property. This included the property identified in the post-nuptial agreement as husband's separate property, some tools and tool chargers, an electric cart, the bedroom sets, the furniture in the den, six telephones, a chest that belonged to his mother, an electric generator and the Sable.

5

Husband also wanted a television, a stereo system, some music and movie tapes, a computer and a safe that he left at the Glenoaks house.

3.       The 1981 Post-Nuptial Agreement

The 1981 post-nuptial agreement was introduced into evidence as Trial Exhibit 3. Paragraph 3 of the agreement states that husband and wife own the real and personal property identified in Schedule "C" as "joint tenants and not tenants in common." Item No. 2 on Schedule C is: "Joint checking acct. at United Calif. Bank, Paradise, Ca." Next to item No. 2 is the handwritten notation, "closed." Paragraph 5 of the agreement states that husband and wife own the real and personal property identified in schedule "E" as "Community Property." Schedule E lists various items separated by room (e.g. living room furniture, dining room furniture, den furniture, master bedroom furniture, etc.).

B.       *The Judgment*

Following a trial on March 2, 2012, the trial court found the Sable and Toyota Avalon to be of equal value and community property; it awarded the Toyota to husband and the Sable to wife. The trial court explained that the usual presumptions applied: (1) property acquired during the marriage is community property [applied to both cars]; and (2) property taken in both names is presumed to be community property. Additionally, because husband was still working for the first three years of the marriage, his pension (i.e., the source of the funds used to buy the cars) was not entirely his separate property. The trial court also awarded husband the items of personal property he requested including a stereo system and music tapes in the entertainment center located in the den at the Glenoaks house, husband's mother's chest, husband's computer and desk, a safe, tools, tool chargers, a generator and an electric cart. Finally, it ordered husband to pay wife monthly spousal support of $716. Judgment of Dissolution and Notice of Entry of Judgment were filed on December 12, 2012. Husband timely appealed.

6

*A.      The Trial Court Did Not Err In Awarding Wife Spousal Support*

Husband contends the award of spousal support to wife was an abuse of discretion. He argues that wife's home should have been viewed as a source of income. We disagree.

"As a general rule, we review spousal support orders under the deferential abuse of discretion standard.  [Citation.]  We examine the challenged order for legal and factual support.  'As long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it.'  [Citations.]  'To the extent that a trial court's exercise of discretion is based on the facts of the case, it will be upheld "as long as its determination is within the range of the evidence presented." '  [Citation.]"  (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1443.)  "We do not substitute our own judgment for that of the trial court, but determine only if any judge reasonably could have made such an order."  (*In re Marriage of Schlafly* (2007) 149 Cal.App.4th 747, 753.)  An abuse of discretion is shown only " ' "where, considering all of the relevant circumstances, the court has 'exceeded the bounds of reason' or it can 'fairly be said' that no judge would reasonably make the same order under the same circumstances." ' "  (*In re Marriage of De Guigne* (2002) 97 Cal.App.4th 1353, 1366.)

Family Code section 4320 sets forth the circumstances the trial court must consider in ordering spousal support.  Relevant here are the following:  (1) the age and health of the parties; (2) the duration of the marriage; (3) the ability of the supporting party to pay spousal support, taking into account earned and unearned income, assets, and standard of living; (4) the needs of each party based on the standard of living established during the marriage; (5) the obligations and assets, including the separate property, of each party; (6) the balance of the hardships to each party; and (7) any other factors the court determines are just and reasonable.

Under California law, a "reverse mortgage" means a nonrecourse loan (1) secured by real property, (2) that provides cash advances to a borrower *based on the equity or*

*value of the borrower's owner-occupied principal residence* and (3) that requires no payment of principal or interest until the entire loan becomes due and payable. (Civ. Code, § 1923, subds. (a) & (b).) A reverse mortgage is a lien against the property. (Civ. Code, § 1923.3.) It is an abuse of discretion for the trial court to reduce spousal support based on the value of the supported spouse's equity in her principal residence. (*In re Marriage of Kuppinger* (1975) 48 Cal.App.3d 628, 635-636 (*Kuppinger*).) Under *Kuppinger*, the trial court correctly refused to consider whether wife could obtain a reverse mortgage on her equity in the Glenoaks house, which was her principal residence, in determining spousal support.

B.     *Substantial Evidence Supports the Finding That the Sable Was Community Property*

Husband contends the trial court erred in finding the Sable was community property, and awarding it to wife. He argues "the evidence undisputedly shows that [husband's] separate property contribution was the full price" paid for the vehicle. We disagree.

The trial court's characterization of property as either separate or community is a factual finding which we review for substantial evidence. (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734 (*Rossin*).) Under that standard, we resolve all conflicts in the evidence in favor of the respondent and indulge "all legitimate and reasonable inferences . . . to uphold the finding. [Citation.]" (*McLellan v. McLellan* (1972) 23 Cal.App.3d 343, 356.)

Generally, all property acquired by a married person during the marriage is presumed to be community property unless traceable to a separate property source. (Fam. Code, § 760.) The court in *Rossin, supra,* 172 Cal.App.4th 725, explained the "Source Doctrine" as follows:  in the absence of a controlling statutory presumption to the contrary, the character of property as community or separate will be determined by the source of assets used to acquire it, although the parties may contract to alter the application of the community property laws. (*Id*. at p. 731.) Characterization depends on

8

three factors: "(1) the time of acquisition; (2) the 'operation of various presumptions, particularly those concerning the form of title'; and (3) the determination 'whether the spouses have transmuted' the property in question, thereby changing its character. [Citation.] In some cases, a fourth factor may be involved: whether the parties' actions short of formal transmutation have converted the property's character, as by commingling to the extent that tracing is impossible. [Citation.]" (*Id*. at p. 732.)

Here, each of those factors support the trial court's finding that the Sable was a community asset. First, it is undisputed that the Sable was acquired during the marriage. Second, it was registered in both husband's and wife's names. Third, there is no evidence that the parties intended to transmute the Sable from community to husband's separate property.

We are not persuaded otherwise by husband's argument that the Sable must be characterized as his separate property based on his testimony that all funds in the joint checking accounts used to pay for the Sable were husband's separate property. (See *Rossin, supra*, 172 Cal.App.4th at p. 734 [mere commingling of separate funds with community funds in a bank account does not destroy the character of the separate funds if the amount thereof can be ascertained]; see also *In re Marriage of Mix* (1975) 14 Cal.3d 604, 610 [property purchased with a spouse's separate property funds remains that spouse's separate property].) Where funds are paid from a commingled account, the presumption is that the funds are community funds. (I*n re Marriage of Frick* (1986) 181 Cal.App.3d 997, 1010.) To overcome the presumption, a party must trace the expended funds to a separate property source. (*Rossin, supra*, at p. 734.) There are two methods of tracing: (1) direct tracing and (2) family living expenses. (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 823 (*Braud*).)

Husband relies on the second method, which the *Braud* court describes as follows: "Under the 'family living expense' or 'recapitulation' method, it is assumed that family living expenses are paid out of community property funds. [Citations.] Payments may be traced to a separate property source by showing community income at the time of the payments or purchase was exhausted by family expenses, so that the payments or

purchase necessarily must have been made with separate property funds. [Citations.] The recapitulation must be sufficiently exhaustive to establish not only that separate property funds were available to make the payments, but that they were actually used. [Citation.] . . . [T]he record must demonstrate that community income was depleted at the time the particular asset was acquired. [Citations.]" (*Id*. at pp. 823-824.)

Once a spouse commingles his separate property in the couple's joint checking account, that spouse assumes "the burden of keeping adequate records to establish the balance of community income and expenditures at the time" the disputed property was acquired with commingled property. (*In re Marriage of Stoll* (1998) 63 Cal.App.4th 837, 841.) Husband has failed to make the requisite showing.

Here, the undisputed evidence was that the Sable was purchased from Star Lincoln on March 14, 2008, for $24,538. The purchase price was paid with two checks, both dated March 14, 2008 and signed by wife: (1) check No. 1191 for $20,000 from Downey Savings account No. 4710 and (2) check No. 2153 for $4,538 check from Department of Water and Power Credit Union account No. 7324. Each check is preprinted with both husband's and wife's names. Trial Exhibit No. 11 includes what appears to be a printout of transactions in Downey Savings account No. 4710 from February 1 through April 2, 2008. The print out shows a balance of $5,068.91 on February 1, 2008. It shows deposits of $10,000 on March 1, 2008, a $10,506.48 on March 6, 2008, and $5,253.26 on March 6, 2008, resulting in a balance of $35,520.98 on March 6, 2008. A handwritten notation next to the $5,253.26 deposit on the printout reads: "Lydia's CD." From deposit slips that were also included in Trial Exhibit No. 11, it appears that the source of the $10,506.48 and $5,253.26 deposits were matured CDs. A handwritten notation on the $10,506.48 deposit slip states: "Ron & Robert CD put in bank for check [illegible] Sable." A handwritten notation on the $5,253.26 deposit slip states: "Lydia's CD matured put in bank joint Roland & Lydia" and "Lydia's CD cashed for Sable car." Wife could not recall whether any of her separate property went towards the purchase of the Sable, but she disagreed that all of husband's pension was his separate property. Wife testified that the handwritten notations made on the documents in Trial Exhibit No. 11

10

were made by husband, and that "Lydia's CD" referred to a CD owned by husband, but payable to wife upon husband's death. There was no evidence of the source of the March 1, 2008 deposit of $10,000 into the Downey Savings account and no evidence of the source of any of the funds in the Department of Water and Power Credit Union Account. Husband testified that wife never deposited anything into the joint checking accounts, but wife testified that she deposited some funds into the household accounts. Husband also concedes that a fraction of his pension was community property. Based on this record, husband failed to trace all of the funds used to purchase the Sable to his separate property.

*C.      Substantial Evidence Supports the Award of Household Goods*

Husband contends all of the household goods purchased since 1987 should have awarded to him since he paid for them with his separate property. For the same reasons we reject husband's contention that the Sable was his separate property, we reject his contention that every household good purchased since 1987 was his separate property. Husband has not introduced any receipts for any item which would show when it was purchased, the manner in which the item was purchased (credit card, debit card, check or cash), who purchased it or the source of funds for the purchase. On this record, the trial court reasonably could have concluded husband has failed to meet his burden of proof.

## DISPOSITION

The judgment is affirmed. Each party shall bear their own costs on appeal.


                                                       RUBIN, ACT. P. J.
WE CONCUR:


        FLIER, J.                                      KUSSMAN, J.[*]

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11