Filed 3/29/24  Marriage of Prince CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of STEPHEN M. and TERESA R. SUNDER PRINCE. | |
| | D080301 |
| STEPHEN M. PRINCE, | |
| Appellant, | (Super. Ct. No. 17FL006027C) |
| v. | |
| TERESA R. SUNDER PRINCE, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia Garcia, Judge.  Affirmed as modified.

William M. Henrich for Appellant Teresa R. Sunder Prince.

Bickford Blado & Botros and Andrew J. Botros for Appellant Stephen M. Prince.

In this marriage dissolution proceeding, Teresa R. Sunder Prince (Wife) and Stephen M. Prince (Husband) both appeal from the final dissolution

judgment, contesting portions of the court's division of property. There are four main categories of division at issue.

First, Wife challenges the court's finding that Husband sufficiently traced commingled funds in two retirement accounts (a Charles Schwab IRA and a Morgan Stanley IRA) to contributions of his separate property, contending that Husband's expert relied on hearsay documents that were not separately offered as evidence or authenticated. In Husband's cross-appeal, he contends the court erred in declining to credit his separate property share in the Charles Schwab IRA with a postseparation contribution, and further erred in declining to credit his separate property share in the Morgan Stanley IRA with a rollover from another account that Husband contends was mixed separate and community property.

Second, Wife challenges the court's finding that Husband sufficiently traced a portion of the downpayment for the family home to his separate property inheritance, arguing that the documents, even if admissible, do not support the tracing.

Third, Wife contends the entire amount of a "Special Bonus" that Husband received as part of a severance package should be characterized as community property, while in his cross-appeal, Husband contends the entire amount should be his separate property.

The fourth and final category at issue is Wife's contention that the community was not entitled to a reimbursement for community funds used to pay expenses related to her separate property.

We agree that there is no substantial evidence to support the court's finding that Husband adequately traced a portion of the home downpayment to his separate property inheritance. In all other respects, we affirm the trial

court.  Rather than remanding the matter, we elect to modify the judgment and affirm the judgment as so modified.

## FACTUAL AND PROCEDURAL BACKGROUND

Husband and Wife married in August 1998.  They lived in Chicago, Illinois at the time.  In the spring of 2003, Husband received a job offer in San Diego, California and the couple moved.  They used their accumulated savings to buy a home in La Jolla in May 2003.  Over the years, they had three children, who were teenagers at the time of trial.

Husband filed the petition for dissolution in this case on June 2, 2017, with a May 26, 2017 date of separation.  Wife agreed to the date of separation.  On December 27, 2018, they filed a stipulation covering temporary child support, temporary spousal support, division of one community asset, and final settlements regarding Husband's restricted stock and future tax deductibility of spousal support.

On December 6, 2021, a four-day trial commenced on remaining issues of property division.  The court issued its orders on December 16, 2021, at which time the court invited the parties to request a statement of decision. Neither did.  The court entered its final judgment on February 18, 2021. Both Wife and Husband appeal from the final judgment.

## DISCUSSION

As an initial matter, because neither Wife nor Husband requested a statement of decision, they both agree that the doctrine of implied findings apply.  " 'A judgment or order of the lower court is presumed correct.  All intendments and presumptions are indulged to support it on matters as to which the record is silent.' " (*Rossiter v. Benoit* (1979) 88 Cal.App.3d 706, 712, italics omitted.)  It is a " 'cardinal principle of appellate review' " that a " ' " 'judgment or order of the lower court is *presumed correct*[, and a]ll

3

intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " ' " (*In re Julian R.* (2009) 47 Cal.4th 487, 498-499.)

A. Tracing of Husband's Separate Property in IRA Accounts.

Husband commingled various separate property retirement funds with community property funds in a Charles Schwab IRA and a Morgan Stanley IRA. Husband's expert, Cindy Jones, testified that she was able to trace Husband's separate property contributions within each account. Wife argues there is no substantial evidence to support the tracing because Jones's expert opinion relied on hearsay documents that were not separately offered as evidence or authenticated, although they were attached to her report that was admitted over objection. We conclude the court did not abuse its discretion in finding that the documents on which it relied for the tracing fell within the business records exception to hearsay.

In his cross-appeal, Husband contends the court erred in declining to characterize a 2021 postseparation contribution into the Charles Schwab IRA as his separate property on the basis that the business records the court found to be reliable did not show the contribution. Husband also contends the court erred in characterizing a rollover from an Equity Institutional IRA into the Morgan Stanley IRA account as community property instead of a mix of community property and his separate property, based on the court's finding that the tracing was not clear. We conclude these findings are supported by substantial evidence.

1. Additional Facts
    a. Charles Schwab IRA

In November 2007, during marriage, Husband opened an IRA with Charles Schwab in his name alone. Husband made a separate property claim

4

to a rollover of his 401(k) funds from his prior employer before marriage, General Electric (GE). He also made separate property claims to two postseparation contributions of $7,000 each, in November 2019 and April 2021. There is no dispute that all other contributions were community property.

i. GE 401(k) Rollover

Prior to marriage, Husband worked at GE from June 1989 until January 1997. He contributed to the GE 401(k) retirement plan and participated in the GE pension plan during his employment. After leaving GE, Husband no longer contributed to the GE retirement or pension plans but did not move the funds for many years.

Husband testified that when he opened the Charles Schwab IRA in 2007, he used his separate property GE 401(k) funds as the opening deposit. He subsequently rolled over 401(k) accounts from other employers that he worked for during marriage, which Husband conceded was community property. Husband claimed that a percentage share of the commingled Charles Schwab IRA could be adequately traced to his separate property GE 401(k) funds.

To support Husband's tracing claims, he retained Cinda Jones to perform financial analyses and prepare reports regarding the Charles Schwab and Morgan Stanley IRA accounts and the downpayment for the La Jolla residence. Jones prepared two reports: (1) Exhibit 23, which contained her analysis of the IRA accounts to determine the percent and value of community property versus Husband's separate property; and (2) Exhibit 44, which contained her analysis of Husband's separate property inheritance contribution to the downpayment. She testified that these

5

reports were based on documents that Husband gave her, which are all attached to the reports.

Husband reviewed Jones's reports. He testified that the chart at pages 45-46 of Exhibit 23 (the Charles Schwab chart) accurately represented all the transactions in the Charles Schwab IRA. He also testified that he provided Jones with all the financial records relevant to the transactions in the Charles Schwab IRA and his separate property claims for this account.

Jones testified that the Charles Schwab chart is her analysis of that IRA. Husband gave her beginning calculations, and she reviewed, edited, and added to it. Husband also gave her the documents attached to her report, which she relied on to verify the numbers in the chart. She assumed the content of the documents that Husband gave her were true. Everything she reviewed was attached to her report.

Jones explained that she used a percentage method for tracing Husband's separate property in the IRA accounts. If separate property retirement funds acquired before marriage were rolled into the IRA account and commingled with community property during marriage, she would determine the resulting percentage of separate property in that account based on the account balance after the rollover. Likewise, if community property were added to the account, she would determine the resulting percentage of community property in the account based on the new balance.

Jones explained that the first entry in the Charles Schwab chart is the opening deposit from Husband's GE 401(k) rollover in November 2007, in the amount of $193,290. The chart identifies this deposit as 100 percent Husband's separate property because he worked at GE before marriage. At the court's request, Jones identified the documents to support this entry, which was a 2007 IRS form 1099R indicating that $193,290 was rolled over

6

from the GE plan. There was also a GE S&SP deductions statement showing an account balance of $193,069. Additionally, there was a Charles Schwab account statement in Husband's name for the period of November 2 through 30, 2007, showing an IRA rollover contribution of $193,290.

The next contribution of $57,487 was identified in the Charles Schwab chart as 100 percent community property because it was a rollover of 401(k) funds from a company that Husband worked for during marriage. Jones explained that the account total after this deposit was $250,777, and of that $193,290 was separate property, which is 77.1 percent of $250,777. Therefore, at that time, 77.1 percent of the Charles Schwab IRA was Husband's separate property and 22.9 was community property. Jones applied this same methodology to each of the subsequent transactions. She characterized the next four contributions as 100 percent community property because they were 401(k) or pension rollovers from Husband's employment during marriage. With each contribution of community property, the chart reflected that the percentage of community property in the account increased and the percentage of separate property in the account decreased.

The chart also showed transfers from the Charles Schwab IRA to an Equity Institutional IRA, discussed below in conjunction with the Morgan Stanley IRA. Jones allocated the amount of these transfers between Husband's separate property and community property on a pro rata basis so that it did not change the percentages in the Charles Schwab IRA.

ii. Postseparation Contributions

The final two contributions into the Charles Schwab IRA, in the amount of $7,000 each, occurred on November 13, 2019 and April 5, 2021. Jones designated these contributions as Husband's separate property because they occurred after the date of separation.

7

The Charles Schwab chart showed that the closing balance as of October 31, 2021 was $876,621. Jones testified that this was supported by the Charles Schwab statement for that period. She concluded that the balance was 42.4 percent Husband's separate property and 57.6 percent community property.

### b. Morgan Stanley IRA

In June 2015, during marriage, Husband opened a Morgan Stanley IRA in his name. Husband claimed that a rollover from an Equity Institutional IRA was a traceable mix of community property and his separate property. He also made a separate property claim to a deposit of his early pension payout from GE, his prior employer before marriage. There is no dispute that all other contributions were community property.

### i. Equity Institutional IRA Rollover

Husband testified that when he opened the Morgan Stanley IRA in 2015, he used a rollover of 401(k) funds from Husband's former employer during marriage as the opening deposit. Husband conceded that these funds were community property. Husband claimed that the next deposit—a rollover from an Equity Institutional IRA—was mixed community property and his separate property.

Husband explained that the Equity Institutional IRA was temporary and had a limited purpose of investing in a start-up company that Husband joined in 2009, during marriage, called CRISI Medical Systems (CRISI). Husband was one of the founders of CRISI. He helped pitch investors and each time the company raised a new round of funding, he made a personal contribution to maintain credibility with those investors. He did not have money available but was able to contribute investments to CRISI through the Equity Institutional IRA.

8

Husband testified that this occurred three times. Each time, he funded the Equity Institutional IRA from the Charles Schwab IRA. When CRISI was acquired, he closed the Equity Institutional IRA and rolled the funds over into the Morgan Stanley IRA.

Husband testified that the chart at page 50 of Exhibit 23 (the Equity Institutional chart) represented all the transactions in the Equity Institutional IRA. He also testified that the chart at page 51 of Exhibit 23 (the Morgan Stanley chart) represented all the transactions in the Morgan Stanley IRA. He provided Jones with all the financial records relevant to his separate property claims in the Morgan Stanley IRA.

Jones pointed to where the Charles Schwab chart showed the transfers to the Equity Institutional IRA. She explained that she characterized each transfer as having the same percentage mix of community property and Husband's separate property that was in the Charles Schwab IRA at the time of the transfer. She did this so that the transfer would not change the percentages in the Charles Schwab IRA.

For example, the Charles Schwab IRA was 55.9 percent community property and 44.1 percent Husband's separate property prior to the first transfer of funds from the Charles Schwab IRA to the Equity Institutional IRA. The transfer was in the amount of $15,000. As shown in the Charles Schwab chart, Jones designated $8,382 as community property (55.9 percent) and $6,619 as Husband's separate property (44.1 percent). She claimed the funds were then transferred to the Equity Institutional IRA carrying the same ratio.[1]

---

[1] As explained in the analysis below, the $15,000 was allocated differently in the Equity Institutional chart.

9

Based on her calculations, after three transfers from the Charles Schwab IRA, the Equity Institutional IRA was 56.6 percent community property and 43.4 percent Husband's separate property. Jones testified that when all the Equity Institutional IRA funds were rolled over to the Morgan Stanley IRA, the funds maintained this same ratio as reflected in the Morgan Stanley chart.

### ii. GE Pension

In August 2017, after the date of separation, GE (Husband's employer before marriage) notified prior employees that they were offering an early payout opportunity for all vested pension holders whose stakes were valued under $50,000. Husband testified that he elected to take his lump-sum payout of about $35,000, which he received in December 2017 and commingled with community property in the Morgan Stanley IRA. Jones testified that the GE pension contribution was the final transaction in the Morgan Stanley IRA. She designated this contribution as Husband's separate property because he worked at GE prior to marriage.

Jones testified that the Morgan Stanley chart was her analysis of that IRA. Husband prepared a draft and she verified the information, made some changes, and confirmed that the numbers in the chart were accurate. Jones testified that she reviewed all the statements related to the transactions and all the supporting documents she reviewed were attached as exhibits to her report.

The Morgan Stanley chart shows that the closing balance as of October 31, 2021 was $366,732. Jones concluded this balance was 36.5 percent Husband's separate property and 63.5 percent community property.

## 2. Court's Ruling

When Husband's attorney sought to introduce Exhibits 23 and 44,[2] Wife's attorney objected and moved to strike Jones's testimony, arguing that under "*People v. Sanchez*, this is an expert's report that's relying entirely on case specific hearsay and thus inadmissible."[3] The court noted that Husband testified to "a lot of case specific information" and the reports fall within the business records exception. The court reserved its ruling. At the close of evidence, Wife's attorney again objected to the admission of Exhibits 23 and 44 on the basis that "both of those are opinions based entirely on hearsay and such that in and of itself is hearsay under *People v. Sanchez*." The court overruled the objection and admitted both exhibits.

The court issued its orders at the next hearing. The court considered Jones to be an expert who assisted the court in the review of financial documents to analyze information and gave an opinion regarding the tracing of certain property. The court found Jones to be credible and her methodology to be sound. However, the court found that not all the tracings were clear or well documented.

Regarding the Charles Schwab IRA, the court ruled that the rollover in November 2007, in the amount of $193,290, was Husband's separate property because it was sufficiently traced to his GE 401(k), which he contributed to before marriage. This was supported by a September 2007 GE S&SP deductions statement, which addressed Husband and showed an account balance of $193,069. Additionally, a Charles Schwab IRA statement for November 2007 showed a rollover contribution of $193,289. Husband also

---

[2] Exhibit 44 is discussed below in conjunction with the downpayment.

[3] *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).

11

provided a 2007 IRS tax form 1099R showing the payor as GE savings and security program and Husband as the recipient, for the same amount of $193,289. The court ruled that "these documents are business documents, and while [Husband] did not introduce them through a custodian of records, the court finds these documents sufficiently reliable and together with his testimony find that they support the tracing analysis performed by Miss Jones."

The court also found that the November 2019, $7,000 postseparation contribution to the Charles Schwab IRA was sufficiently traced to Husband's separate property. Husband supported this tracing with a 2019 IRS tax form 5498 showing Husband as the participant and Charles Schwab the issuer. He also provided the Charles Schwab IRA statement from November 2019 showing the contribution of $7,000. The court again ruled that "these documents are records that were not provided through a custodian of records, however, the court finds these documents sufficiently reliable and sufficient to support the expert's analysis." The court denied Husband's separate property claim to the second $7,000 postseparation contribution to the Charles Schwab IRA in April 2021. The court noted that there were several documents to support this tracing but the only business document that it found to be reliable was the Charles Schwab statement for April 2021, which did not document a contribution for 2021.

Based on the court's rulings regarding Husband's separate property claims, the court found that the balance of the Charles Schwab IRA was "41.9 percent separate property and 48.1 percent community property." After realizing that this did not equal 100 percent, the court at a subsequent hearing clarified that the Charles Schwab IRA was 41.9 percent Husband's separate property and 58.1 percent community property. This is the ratio

reflected in the Charles Schwab chart, based on the court's ruling denying Husband's separate property claim to the second $7,000 postseparation contribution. However, the judgment still reflects a 41.9 and 48.1 percent split. On appeal, Wife and Husband agree that based on the court's rulings, the judgment should reflect 41.9 percent Husband's separate property and 58.1 percent community property.

Regarding the Morgan Stanley IRA, the court denied Husband's claim that the rollover from the Equity Institutional IRA had any separate property character. The court acknowledged that Husband claimed the Equity Institutional IRA was funded with mixed property from the Charles Schwab IRA, and that the transferred funds maintained the same mixed character. However, the court found that the tracing was not clear and not well supported by reliable documentation. The judgment reflects that the funds in the Equity Institutional IRA were community property.

The court found that the $35,127 contribution to the Morgan Stanley IRA on December 6, 2017 was sufficiently traced to Husband's separate property GE pension pay out. In support of this, Husband provided a GE company statement addressed to him, documenting a payment of $35,127. He also provided a 2017 IRS tax form 1099R showing GE pension trust as the payor, Husband as the recipient, and a gross distribution of $35,127. Additionally, a Morgan Stanley IRA statement for December 2017 documented a check deposit of $35,127. Again, the court ruled that "these documents are business records that were not provided through a custodian of records, however, along with [Husband's] testimony, the court's finding these documents sufficiently reliable and sufficient to support a finding that 16 percent of the Morgan Stanley IRA account is separate property and 84 percent is community property."

The judgment reflects that the Morgan Stanley IRA is 16 percent Husband's separate property and 84 percent community property. Based on the Morgan Stanley chart, this is the ratio after applying the court's ruling that the Equity Institutional IRA contribution was community property.

    3. Analysis

In her appeal, Wife contends that the tracing of Husband's separate property in the Charles Schwab IRA and the Morgan Stanley IRA were not supported by substantial evidence because the documents on which Jones and the court relied were hearsay. We disagree.

In his cross-appeal, Husband contends the court erred in declining to characterize the April 2021 postseparation contribution to the Charles Schwab IRA as his separate property. Husband also argues the court erred in declining to characterize the Equity Institutional IRA rollover into the Morgan Stanley IRA as a mix of community property and his separate property. We disagree with Husband on both issues.

As such, we affirm the court's ruling regarding the Charles Schwab IRA, but correct the clerical error in the judgment to reflect that the account is 41.9 percent Husband's separate property and 58.1 percent community property. We also affirm the ruling regarding the Morgan Stanley IRA.

    a. Relevant Legal Principles and Standards of Review

Property acquired before marriage and property acquired during marriage by bequest, devise, or descent are presumptively the separate property of a spouse (Fam. Code, § 770, subd. (a)) and other property acquired during marriage is presumptively community property (Fam. Code, § 760). (*In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1472 (*Brandes*).)

To the extent a spouse's separate property funds are commingled with community property, those separate property funds are presumed to be community property unless the spouse rebuts that presumption with documentary evidence tracing the funds to the spouse's separate property. (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 822-823 (*Braud*) ["the mere commingling of separate property and community property funds does not alter the status of the respective property interests, provided that the components of the commingled mass can be adequately traced to their separate property and community property sources"]; *In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 274 (*McLain*) ["tracing requires documentary proof"].)

On appeal, we review a trial court's finding of fact regarding whether a spouse has adequately traced funds to a separate property source for substantial evidence. (*Braud, supra*, 45 Cal.App.4th at p. 823.) If substantial evidence supports that factual finding, we must uphold it "even though evidence conflicts or supports contrary inferences." (*In re Marriage of Grinius* (1985) 166 Cal.App.3d 1179, 1185 (*Grinius*).) Substantial evidence is not synonymous with any evidence or a mere scintilla of evidence, but is only evidence that is of ponderable legal significance, reasonable in nature, credible, and of solid value. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005-1006; *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873.)

b. Wife's Appeal

Regarding the IRA accounts, Wife does not argue that the documents on which the court relied did not support the tracing. She makes a broader evidentiary argument that the documents were hearsay not properly before the court. And without documentary proof, Husband cannot satisfy the

15

tracing requirements. (*McLain, supra*, 7 Cal.App.5th at p. 274 ["tracing requires documentary proof"].)

The court found that Husband met his burden of tracing his separate property GE 401(k) contribution to the Charles Schwab IRA. As documentary support for this, the court noted that "[Husband] provided" a GE S&SP 401(k) deductions statement, a Schwab IRA account statement, and an IRS tax form 1099R. The court also found that Husband sufficiently traced the 2019 postseparation contribution to the Charles Schwab IRA, noting that "he provide[d]" an IRS tax form 5498 and a Schwab IRA account statement. Regarding the Morgan Stanley IRA, the court found that Husband met his burden of showing that the GE pension contribution was his separate property, stating "he . . . provided" a GE statement, a Morgan Stanley IRA account statement, and an IRS tax form 1099R.

Wife argues the court "relied on its mistaken conclusion that Husband himself provided documents in support of the tracing." She contends Husband could not provide the documents to the court because they were hearsay, and he made no effort to except the documents from the hearsay rule. Instead, Husband provided the documents to Jones, who presented the documents to the court as truth and relied on the documents to render her opinion, and the court relied on Jones. According to Wife, the court acknowledged the documents were hearsay but because Jones relied on them, the court found that the documents were reliable. In other words, Wife contends Husband used Jones's expert testimony and report to get around the hearsay issue and to "transform hearsay into admissible evidence."

Wife argues that while an expert may rely on hearsay in reaching an opinion, the expert without personal knowledge may not testify to the truth of case-specific facts unless there is admissible evidence of those facts.

16

(Citing *Sanchez, supra*, 63 Cal.4th at p. 686.)  Indeed, as Wife points out, Jones testified that she assumed the information in the documents that Husband gave her was true.  We agree that an expert's reliance on information in hearsay documents does not make the information factually true.  We disagree, however, that the documents underlying Jones's opinion were not offered as evidence pursuant to any hearsay exception and were therefore not before the court.

"A trial judge has broad discretion in admitting business records under Evidence Code section 1271." (*People v. Dorsey* (1974) 43 Cal.App.3d 953, 961 (*Dorsey*).)  "The general rule with respect to documents offered under an exception to the hearsay rule is that the party offering the documents bears the burden of establishing the foundational requirement of trustworthiness." (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 319.)  The foundation for admitting a business record "is properly laid if in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." (*People v. Williams* (1973) 36 Cal.App.3d 262, 275.)  Additionally, the foundation requirements may be inferred from the circumstances.  (*Dorsey,* at pp. 960-961.)  A trial court has "wide discretion in determining whether sufficient foundation is laid to qualify evidence as a business record.  On appeal, exercise of that discretion can be overturned only upon a clear showing of abuse." (*People v. Lugashi* (1988) 205 Cal.App.3d 632, 638-639.)  We will find an abuse of discretion by a trial court only when we conclude that under all the circumstances, viewed most favorably in support of the decision, no judge reasonably could have made that decision.  (*Estate of Sapp* (2019) 36 Cal.App.5th 86, 104.)

This case is distinguishable from *Garibay v. Hemmat* (2008) 161 Cal.App.4th 735 (*Garibay*), cited by Wife.  There, the Court of Appeal

17

concluded that a medical expert's opinion had no evidentiary value where the expert relied on his review of medical records that had not been offered into evidence. (*Id.* at p. 737.) The court acknowledged that the medical records could have been placed before the trial court under the business records exception but there was no attempt to do so. (*Id.* at p. 738.) The records did not accompany the doctor's declaration or the summary judgment motion. (*Id.* at p. 737)

Here, Husband did offer the underlying documents into evidence. Wife contends giving the documents to the expert is not the same as giving them to the court, but unlike in *Garibay*, the documents that Husband gave to Jones were attached to her report, which Husband through his attorney offered into evidence. It makes no difference that the documents were admitted as part of Jones's report rather than as a separate exhibit because contrary to Wife's interpretation of the record, Husband did not circumvent the hearsay rule by attaching the documents to Jones's report. And the court did not find the documents to be reliable merely because Jones relied on them. Instead, the court found that the documents fell within the business records exception to the hearsay rule.

Wife does not argue that the court abused its discretion in admitting the documents under the business records exception to hearsay. She instead contends there is no substantial evidence to support an inference that the trial court found the exception applied. In our view of the record, we need not infer this: the court stated, when discussing Exhibits 23 and 44, that "there's an exception for business documents." And when discussing the specific documents on which the court relied to support the tracing, it stated that they were business documents or business records. The court acknowledged that Husband did not introduce the documents "through a custodian of

18

records, however, along with [Husband's] testimony, the court[ ] [found] these documents sufficiently reliable." Under these circumstances, we find no abuse of discretion in applying the business records exception.

We find *Dorsey* instructive, where the Court of Appeal reasoned that bank statements prepared in the regular course of banking business are in a different category than ordinary business and financial records of a private company. (*Dorsey, supra*, 43 Cal.App.3d at p. 960.) "It is common knowledge that bank statements on checking accounts are prepared *daily* and that they consist of debit and credit entries based on deposits received, the checks written and the service charges to the account." (*Ibid.*) Therefore, the appellant was not prejudiced by the absence of testimony as to the method of preparation of the records. (*Id.* at pp. 960-961.) Such testimony would not have a bearing on the basic trustworthiness of the records. (*Ibid.*) The court in *Unifund CCR, LLC v. Dear* (2015) 243 Cal.App.4th Supp. 1 applied this reasoning to credit card billings and bank records. (*Id.* at pp. 8-9.) We see no reason not to apply this to 401(k) account statements, IRA statements, and tax documents, especially where their accuracy was not called into question. The trial court did not abuse its discretion in finding that the documents on which it relied to support the tracing in the IRA accounts were sufficiently trustworthy to qualify as business records under Evidence Code section 1271.

Wife also argues that Husband did not authenticate the documents. "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.) As Husband points out, Wife did not object on the basis of failure to authenticate during trial. By not objecting, Wife has waived any challenge on this basis on appeal. (Evid. Code, § 353.)

Nonetheless, the documents were authenticated by circumstantial evidence. (*People v. Gibson* (2001) 90 Cal.App.4th 371, 383 ["Circumstantial evidence, content and location are all valid means of authentication"].) As the court noted, the documents showed accounts in Husband's name, distributions from his prior employers, and tax forms with his name. The documents also reflected the transactions that Husband testified to, for example, when and how the accounts were opened, and rolling over 401(k) funds into the IRA accounts. Husband testified that he gave Jones all the underlying financial documents to support these transactions and Jones testified that she based her opinion on the documents that Husband provided to her and that all the documents were attached to her report.

Any genuine doubts about the authenticity of the documents attached to Jones's report could have been easily resolved by Husband testifying that the documents were what they purported to be—i.e., his IRA statements, 401(k) statements from his employers, and tax forms. (See *McAllister v. George* (1977) 73 Cal.App.3d 258, 263 [concluding plaintiff's testimony that he received dental services, that exhibit 7 was the bill he received for those services, and that he paid the bill, was sufficient evidence of the circumstances surrounding the document to sustain finding that it was what it purported to be—a bill for dental services].)

In sum, the business records relied upon by Jones and attached to her report provided substantial evidence to support the court's finding that Husband adequately traced his separate property GE 401(k) contribution and 2019 postseparation contribution in the Charles Schwab IRA, and his separate property GE pension contribution in the Morgan Stanley IRA.

20

c. Husband's Cross-appeal

    i. 2021 Postseparation Contribution to Charles Schwab IRA

Husband contends the court erred in declining to characterize the April 2021 postseparation contribution of $7,000 into the Charles Schwab IRA as his separate property.

He refers to the court's statement that the only document it found to be reliable was the Charles Schwab statement for the period April 30, 2021, and that this statement did not document a contribution for 2021. Husband contends that this statement does document a $7,000 deposit in April 2021 in two places: (1) under "Transaction Detail," a deposit received on April 5, 2021 in the amount of $7,000 described as "IRA LAS YEAR CON;" and (2) under "Contribution Summary," a $7,000 "Traditional IRA" contribution listed under the year 2020. On appeal, Husband explains that the contribution was listed under the year 2020 because that was the tax year when he took the income deduction. However, he does not cite to any testimony or evidence in support of this.

Additionally, we must uphold a trial court's factual finding regarding tracing if supported by substantial evidence, even if there is a conflict in the evidence or evidence supports contrary inferences. (*Grinius, supra*, 166 Cal.App.3d at p. 1185.) We note that the Charles Schwab statement on which the court relied to characterize the other postseparation contribution in 2019 as Husband's separate property lists the contribution under the year 2019. In contrast, the April 2021 statement shows an amount of "0.00" for "Traditional IRA" contributions in 2021. This constitutes substantial evidence to support the court's finding that Husband did not adequately trace the $7,000 contribution in 2021 to his separate property.

21

Husband also points to a copy of a Charles Schwab deposit receipt showing a "Domestic Check" deposit on April 2, 2021 in the amount of $7,000. Under "Contribution," this deposit is listed as "2020REG IRA." Husband claims this means that the deposit was to be applied to the 2020 tax year. Again, there is no evidence or testimony regarding this, and inferences and conflicts in the evidence must be resolved to support the court's finding. (*Brandes, supra*, 239 Cal.App.4th at p. 1472.)

In sum, substantial evidence supports the court's finding that Husband did not sufficiently trace the April 2021 $7,000 contribution in the Charles Schwab IRA to his separate property.

### ii. Equity Institutional IRA Rollover to Morgan Stanley IRA

Husband argues the trial court erred in characterizing the Equity Institutional IRA rollover into the Morgan Stanley IRA as community property instead of a mix of community property and his separate property.

The Equity Institutional IRA was fully funded by three rollovers from the Charles Schwab IRA. Husband explains that the Charles Schwab IRA had a mixed character of community property and his separate property that evolved over time based on the character of each new contribution. The rollovers from the Charles Schwab IRA to the Equity Institutional IRA would carry the same ratio of mixed character as the funds in the Charles Schwab IRA at the time of the rollover. Husband claims the resulting character of the Equity Institutional IRA funds that was rolled over to the Morgan Stanley IRA was 43.4 percent his separate property and 56.6 percent community property. Based on this character mix of the Equity Institutional IRA rollover into the Morgan Stanley IRA, the Morgan Stanley IRA would have an ending mix of 36.5 percent Husband's separate property and 63.5 percent community property.

22

Husband argues the court erred in ruling that the Morgan Stanley IRA had a character mix of 16 percent his separate property and 84 percent community property. He contends there is no evidence to support such a character mix. Based on the Morgan Stanley chart, if the Equity Institutional rollover were considered to be 100 percent community property, the resulting character of the Morgan Stanley IRA would in fact be 16 percent Husband's separate property and 84 percent community property. Husband speculates that the likely root of the error is that the court incorrectly interpreted the Morgan Stanley chart. Husband points to a column that indicates that the funds in the Morgan Stanley IRA was 100 percent community property and 0 percent Husband's separate property *prior* to the rollover from the Equity Institutional IRA. Husband speculates that the court mistakenly believed that this represented the character mix of the *incoming* rollover from Equity Institutional IRA.

The record is clear that the court did not misinterpret anything. The court acknowledged Husband's claim that the Equity Institutional IRA was funded by rollovers of mixed character from the Charles Schwab IRA; however, Husband ignores that the court found the tracing was not clear and not well supported by reliable documentation. Based on this, the court denied Husband's claim that the funds in the Equity Institutional IRA had any separate property character.

Regardless of whether substantial evidence supported Husband's claims regarding the movement of funds from the Charles Schwab IRA to the Equity Institutional IRA, then to the Morgan Stanley IRA, we agree with the trial court that the tracing of the community versus separate property character of those funds was unclear. This is evidenced by Jones's own charts and calculations.

Jones explained that she characterized each withdrawal from the Charles Schwab IRA as mixed community property and Husband's separate property such that it would not change the ratios in the Charles Schwab IRA. For example, as shown in the Charles Schwab chart, that account was 44.1 percent Husband's separate property and 55.9 percent community property prior to the first transfer from the Charles Schwab IRA to the Equity Institutional IRA on June 21, 2010. The transfer was in the amount of $15,000, of which 44.1 percent Husband's separate property equaled $6,619 and 55.9 percent community property equaled $8,382. Jones testified that the funds were then transferred to the Equity Institutional IRA carrying the same ratio.

However, the Equity Institutional chart shows that the first deposit of $15,000 on June 21, 2010 was characterized as 43.9 percent Husband's separate property in the amount of $6,587 and 56.1 percent community property in the amount of $8,413. Husband presented no explanation for the discrepancy below and does not address it on appeal. For this reason alone, substantial evidence supports the court's finding that Husband did not meet his burden of adequately tracing his separate property share of the funds within the Equity Institutional IRA.

B. Downpayment

Husband claimed that he used an inheritance as part of a downpayment for the family's La Jolla residence. The court granted Husband's request for reimbursement. Wife argues there was insufficient evidence to support the tracing of the downpayment for the La Jolla residence to Husband's separate property inheritance.

As with the IRA accounts, Wife argues Jones's expert opinion relied on hearsay documents and the court's finding was therefore not supported by

24

substantial evidence. For the reasons discussed above, we reject this argument.

Wife further argues that even if Jones's report and the documents attached thereto were properly admitted, the documents nevertheless did not establish that a portion of the downpayment was traced to Husband's inheritance. As discussed below, we agree that the documents do not support the tracing.

After Husband's grandmother and father passed away in 1999, he received an inheritance of about $84,000. He testified that in 2000 and 2001, the inheritance was deposited in three increments into Husband and Wife's joint checking account at First Chicago Bank, commingled with community property funds. The receipt and deposit of the inheritance funds is not in dispute.

At the time of the inheritance, Husband and Wife were still living in Chicago and incurring unusual but significant expenses related to fertility treatments while saving for a home. Husband testified that by the end of 2001, they had about $182,000 "total in savings." By the end of 2002, they had "almost $350,000 saved." They spent a little over $80,000 on fertility expenses but then "got back to" $350,000 in 2003.

When Husband and Wife moved to San Diego, they purchased the La Jolla residence in May 2003, for $1.1 million. Husband testified that they paid the $350,000 downpayment from their joint Dreyfus Money Market Fund, which Husband called their "collective savings account money market." The downpayment was paid through two escrow payments of $30,000 on May 1, 2003 and $320,000 about 15 to 20 days later. The amount of the downpayment and the account from which it was paid is not in dispute. Husband claimed that the downpayment comprised of community savings,

25

his $84,000 separate property inheritance, and the remainder of a 401(k) account not relevant to this appeal. He testified that he "expressly ma[d]e it clear" to Wife that the downpayment would consist of his separate property inheritance. Wife testified that the source of the downpayment was "funds that we had saved in Chicago."

Husband testified that during the marriage, all expenses were paid "through the joint checking account with very few exceptions." He also testified that the first time the net monthly income dipped below the expenses in the household was April 2007, well after the La Jolla residence purchase. Husband explained that they kept extensive records of everything using a program called "Quicken." When asked "what amount remained in the joint checking accounts and savings account" after closing, Husband testified about $5,500. He provided Jones with all the financial statements related to the tracing of his inheritance.

Jones testified that Exhibit 44 was her report regarding the tracing of Husband's separate property inheritance contribution to the downpayment for the La Jolla residence. In connection with this report, focusing on the period from when Husband received the first inheritance check in January 2000 until the date of the downpayment in May 2003, Jones reviewed "the Quicken books, records of transactions for the Prince family, their savings to accumulate the funds for the down payment on their residence." Everything she reviewed was attached to her report.

Jones explained that two graphs on page 14, the final page of her report, "is the report of the balances of the savings and how it correlates to the money that came into the checking account. So the funds — the separate funds, inherited funds were deposited into the checking account. And then they were moved to the savings account — to the money market savings

26

account." Jones testified that Husband created the graphs and she verified the numbers in Quicken with respect to the two accounts: "the joint checking and the money market savings account."

Based on the graphs, Jones testified that she was able to determine whether Husband and Wife exhausted community funds from the time Husband received the first inheritance check in January 2000 up until the purchase of the La Jolla residence in May 2003. Jones stated "you can see that as the money came in, the savings never really dropped. It just stayed pretty much the same all the way through. And you look at the total of [Husband's and Wife's] family money market savings account." This suggested to Jones "that the inherited money was always within the accounts. Because the parties were heavily saving. And that balance kept going up, rather than going down. So this is a graph that shows the cumulative accounts. And that the parties never had to use any of the inherited funds because they had more than sufficient community funds that were going into the checking and the savings."

In ruling on Husband's claim that the downpayment for the La Jolla residence included his separate property inheritance, the court noted that after the date of marriage in 1999 until the 2003 downpayment, the parties saved a substantial amount of almost $350,000. Pursuant to Jones's review of the "Quicken accounts, the deposits to different accounts and the movement of the funds, the total of the parties' savings and investment accounts never dropped below the amount of the inherited separate property." The court "accept[ed] the expert's tracing of [Husband's] inherited funds toward the down payment on the purchase of the family residence." Therefore, the court granted Husband's request for reimbursement of $84,044 under Family Code section 2640.

27

However, it is not enough to establish that the inheritance was available at the time of the downpayment; there must be substantial evidence that the inheritance was actually used for the community purchase. (*Braud, supra*, 45 Cal.App.4th at pp. 823-824.)

Family Code section 2640 provides that "unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate to the extent the party traces the contributions to a separate property source." (Fam. Code, § 2640, subd. (b).)

There are two tracing methods for tracing expended funds to a separate property source: "direct tracing" or "family living expense tracing." Under the "direct tracing" method, the disputed asset (in this case the downpayment for the La Jolla residence) is traced to the withdrawal of separate property funds from the commingled account. This method requires specific records reconstructing each separate and community property deposit, and each separate and community property payment as it occurs. (*Braud, supra*, 45 Cal.App.4th 797, 823.)

Under the "family living expense" method, it is assumed that family expenses are paid out of community funds. Payments may be traced to a separate property source by showing community income at the time of the purchase was exhausted by family expenses, so that the purchase necessarily must have been made with separate property funds. The recapitulation must be sufficiently exhaustive to establish not only that separate property funds were available to make the purchase, but that they were actually used. (*Braud, supra*, 45 Cal.App.4th at pp. 823-824.)

Here, there is no documentary link between the inheritance funds in the First Chicago account and the downpayment funds from the Dreyfus account. The record contains no documentary evidence that the inheritance funds deposited into the First Chicago joint checking account were ever transferred to the Dreyfus savings account. Husband testified that the separate property funds were used to pay part of the downpayment, and Jones testified that the inheritance was deposited into the checking account then moved to the savings account but there are no records to support this. (*McLain, supra*, 7 Cal.App.5th at p. 274 ["tracing requires documentary proof"].) As in *Braud*, "[g]iven the exacting standards of proof required for tracing funds in a commingled account," in the absence of bank records or other records, testimony regarding the use of separate funds is "plainly insufficient" to establish that separate property funds were "actually used" for the community purchase. (*Braud, supra*, 45 Cal.App.4th at p. 824.) In *Braud*, as here, no documents relating to the joint checking account were admitted at trial. (*Ibid.*)

Attached to Jones's report is a copy of a Dreyfus Money Market statement for December 2003, showing that after the downpayment, only about $5,000 remained in that account. Husband argues that this shows they exhausted all community funds and lacked sufficient funds for the downpayment without Husband's inheritance. However, again, there are no documents showing that the Dreyfus Money Market account ever contained any of Husband's inheritance. (Cf. *In re Marriage of Mix* (1975) 14 Cal.3d 604, 612 ["If at the time of the acquisition of the property in dispute, it can be shown that all community income *in the commingled account* has been exhausted by family expenses, then all funds remaining in the account at the

29

time the property was purchased were necessarily separate funds."  (Italics added.)].)

Husband contends the graphs on page 14 of Exhibit 44, showing the joint First Chicago checking account on the top and the joint Dreyfus Money Market savings account on the bottom, establish that his inheritance was deposited into the checking account then moved to the savings account "as indicated by the transient up spike in checking balance when the funds arrived, and the corresponding long-term level increase in savings following transfer."  However, Jones's report contains no supporting documents—i.e., bank statements showing account balances—to support the data points in these graphs.  Jones testified that she reviewed the Quicken reports and "records of transactions" with respect to the two accounts to confirm the numbers in the graphs, but she also testified that everything she reviewed was attached to her report at Exhibit 44.  As noted, there are no documents attached to her report that show a withdrawal of Husband's inheritance from the First Chicago checking account or a deposit of the same into the Dreyfus Money Market savings account.  As a result, Husband's evidence was insufficient to meet the "exacting standards of proof" required to trace his separate property inheritance to the downpayment for the family residence. (*Braud, supra*, 45 Cal.App.4th at p. 824.)

In sum, we conclude there is no substantial evidence to support a finding that Husband's inheritance was withdrawn from the Dreyfus Money Market account to contribute to the downpayment.  Accordingly, we modify the judgment to provide that Husband's request for Family Code section 2640 reimbursement on the purchase of the family residence in the amount of $84,044 is denied.

C.  Husband's Special Bonus

Wife and Husband both appeal the court's order regarding a "Special Bonus" that Husband received as part of a severance package from a company that Husband worked for during marriage and up until about one-and-a-half months after the date of separation.  The court concluded the Special Bonus was 50 percent community property and 50 percent Husband's separate property.  In her appeal, Wife contends the court erred in allocating any amount to Husband's separate property.  In his cross-appeal, Husband contends the court erred in allocating any amount to community property.  We address both appeals in conjunction and find no error.

1.  Additional Facts

As noted above, Husband joined the start-up company CRISI in 2009.  In 2013, CRISI entered into an agreement with Becton, Dickinson and Company (BD) that included an option for BD to purchase CRISI.  In connection with this agreement, CRISI and BD agreed to a "Key Resources Performance Bonus," set forth in a Key Resources Performance Bonus Letter dated June 14, 2013 (Performance Bonus Letter).

The Performance Bonus Letter provided that if and when a sales target was reached for a specific product, certain individuals including Husband, referred to as "Key Resources," would be paid a "Performance Bonus" of up to $2,000,000 in the aggregate.  The sales target was $300,000 during any single fiscal quarter up to and including the fourth fiscal quarter after the fiscal quarter during which the first sale took place.

The Performance Bonus Letter also stated that each Key Resource must be employed by BD at the time the sales target was achieved.  In the event a Key Resource was terminated without cause or resigned following achievement of the sales target but before payment, that Key Resource would

31

still be entitled to the Performance Bonus payment. Additionally, if a Key Resource was subject to an involuntary termination prior to achieving the sales target but within the same fiscal quarter, the Key Resource would be entitled to receive the Performance Bonus payment. Finally, any Key Resource who was no longer employed by BD but was still entitled to receive the Performance Bonus payment had to sign a general release.

Husband acknowledged that the Performance Bonus Letter provided for a Performance Bonus but testified that the sales target was never achieved.

BD acquired CRISI in March 2015. As a result, Husband became employed by BD. In anticipation of and contingent on the acquisition, Husband entered into an employment agreement with BD dated February 16, 2015 (Employment Agreement). Husband began work at BD on March 2, 2015.

The Employment Agreement addressed the Performance Bonus provided for in the Performance Bonus Letter:

> 4. Key Resources Performance Bonus. You will have the opportunity to earn a key resources performance bonus pursuant to the terms set forth in Schedule I hereto (the "Side Letter"). Notwithstanding anything to the contrary in the Side Letter, if the Sales Target (as defined in the Side Letter) is achieved after your death, Disability or after you experience a termination by the Company by reason other than for Cause (as defined in Section 5), you will be eligible to receive such bonus subject to the other terms and conditions of the Side Letter. For clarity, measurement of the Sales Target as defined in the Side Letter shall coincide with the recognized revenue of the Intelliport Business Unit.

Husband acknowledged that the Employment Agreement indicated he was entitled to the Performance Bonus and agreed that Schedule I was the Performance Bonus Letter, dated June 14, 2013.

On June 14, 2017 (about two-and-a-half weeks after the May 26, 2017 date of marital separation), BD informed Husband that his group was being laid off and presented him with a severance package. Husband negotiated the severance package, which was finalized on June 30, 2017, and signed on July 15, 2017 (Severance Agreement).

Husband testified he received about $69,000 as severance pay, about four months of COBRA cost sharing, and the "Special Bonus" that is the subject of dispute.

Paragraph 2 of the Severance Agreement titled "Severance Benefits" states as follows:

> a. Severance Pay. As consideration for Your agreement to the terms, releases and covenants not to sue set forth below, the Company will pay You a lump sum severance payment . . . in the amount of **$69,760**. . . .
>
> b. COBRA – Cost Sharing. . . .
>
> c. Special Bonus. *As further consideration for Your agreement to the terms, releases and covenants not to sue set forth below*, the Company will pay You a lump sum payment equal to **$130,386.52**, less applicable payroll withholdings (the "Special Bonus"). *You acknowledge and agree that the Special Bonus is in lieu of any right You may have or could ever have to receive the Performance Bonus, as such term is defined in the Key Resources Performance Bonus Letter* by and among You, the Company and the other parties thereto, dated as of June 14, 2013. The Special Bonus will be paid to You within thirty (30) days following the Effective Date. (Italics added.)

Paragraph 5 of the Severance Agreement, titled "General Release" provides:

> The Company and You have entered into this Agreement to settle all known and unknown claims You might have against the Company . . . and to resolve any bona fide dispute regarding wages owed. As consideration for the Severance Benefits described in Paragraph 2 above, You . . . hereby irrevocably and unconditionally release (give up) any and all known and unknown claims . . . You presently may have, including but not limited to those arising out of Your employment with and separation from the Company ("Claims"), with respect to any Release identified below. [¶] . . . [¶]

During his testimony, Husband acknowledged that paragraph 2(c) of the Severance Agreement states that the Special Bonus is in lieu of any rights he would have pursuant to the Performance Bonus Letter. However, he did not have any understanding that the Special Bonus consisted of a Performance Bonus. His understanding was that the Special Bonus was for him signing the release agreement, not suing BD, and releasing any further claims.

Husband explained that he was not entitled to the Performance Bonus because the sales target was never achieved. When he was laid off, he did not have any expectation that he would be receiving the Performance Bonus payment. According to Husband, at the time of the trial, he was not entitled to any Performance Bonus payment because he was not employed by BD. He testified that the Performance Bonus had many requirements, one being $300,000 in revenue. After many years, nothing had ever been sold so that was never achieved.

Husband testified that he was frustrated with BD because after being laid off it would be impossible to ever achieve the Performance Bonus. This

was one of the topics he raised with BD in association with his release of claims. Other issues were whether he could get another job at BD and his desire for a longer severance package. He also testified that a lot of the negotiations "related to the way I was treated on the exit and the fact that I felt a bit discriminated against when I was asked to leave the company." He "honestly did contemplate suing them" and he was having discussions with other leaders in the company about the possibility of filing a complaint.

BD paid the severance and Special Bonus in one check, which was automatically transferred into Husband and Wife's joint checking account. Husband then determined that the net amount of the Special Bonus after taxes was about $86,000 and moved that amount into his own Morgan Stanley investment account. Husband did not make any separate property claims to the severance payment but claimed that the full amount of the Special Bonus was his separate property.

2.  Court's Ruling

The court ruled that the net $86,120 Special Bonus was 50 percent Husband's separate property and 50 percent community property. The court charged Husband with $43,060, half of the Special Bonus as community property received by him.

The court summarized Husband's testimony that when BD laid him off, he felt mistreated, did not feel he was compensated adequately, and thought he could possibly sue the company. He negotiated better terms of his severance package and ultimately received a severance for loss of income and COBRA coverage. He also received a Special Bonus, which the court stated was "further consideration for his agreement to the terms and releases and covenants not to sue as well as in lieu of any right he may have or could ever

35

have to receive the performance bonus as defined in the key resources performance bonus letter dated June 14, 2013."

The court noted that pursuant to the Performance Bonus Letter, each Key Resource was required to be employed by BD on the date that the sales target was achieved to be paid the Performance Bonus. However, pursuant to the subsequent Employment Agreement, the court noted Husband was "entitled to his performance bonus pursuant to paragraph 4, irrespective of whatever that schedule one key resources bonus letter says, and it states if — that he's entitled to that performance bonus, even if the sales target is achieved after Husband, Mr. Prince is terminated from [BD]."

The court interpreted this to mean that when Husband entered into the Employment Agreement with BD, "it's included in his contract that he has the right to receive the performance bonus after termination whether or not he's employed at [BD] on the date that the sales target is achieved. So when Mr. Prince was terminated, it was unknown whether the sales target would ever be achieved and he would ever receive payment. But he converted that possibility into actual dollars by giving up his right to it. And it is part of that special bonus." The other part was giving up his right to sue.

The court characterized the part of the Special Bonus that related to the Performance Bonus as community property and the part that related to Husband's right to sue as his separate property. The court determined that each part was one-half of the Special Bonus. While the Special Bonus was $130,387, Husband calculated the net amount to be $86,120, which he withdrew from the joint account and moved it into his own account. Therefore, the court charged Husband with one half of that amount, $43,060, as community property received by him. The court designated the other $43,060 as Husband's separate property.

3. Analysis

Wife and Husband both appeal the court's allocation of the Special Bonus, making similar but competing arguments. We conclude that neither Wife nor Husband met their burden of showing error.

"The primary object of contract interpretation is to ascertain and carry out the mutual intention of the parties at the time the contract was formed, determined from the writing alone, if possible. [Citations.] When the language of a contract is 'clear, explicit, and unequivocal, and there is no ambiguity, the court will enforce the express language.' " (*In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 688.) Courts must interpret contract language in a matter that gives force and effect to every provision and avoid construction that would render any provisions or words surplusage. "Put simply, '[a] contract term should not be construed to render some of its provisions meaningless or irrelevant.' " (*Ibid.*; Civ. Code, § 1641.) Courts may also consider the circumstances under which the contract was made, as well as other extrinsic evidence that illuminates the parties' intent; but not to give the contract a meaning to which it is not reasonably susceptible. (*Ibid.*; *Trolan v. Trolan* (2019) 31 Cal.App.5th 939, 949 (*Trolan*); Civ. Code, § 1647.) Moreover, if the language of the contract clearly sets forth the intent, the court does not consider extrinsic evidence; it only looks to extrinsic evidence in the event of an ambiguity. (*Trolan,* at p. 949.)

The interpretation of a contract presents a question of law unless it turns on the credibility of extrinsic evidence or a conflict therein. (*Trolan, supra,* 31 Cal.App.5th at p. 949.) Because our resolution of this matter does

37

not turn on a conflict in or credibility of extrinsic evidence, we apply the de novo standard of review.[4]

The first sentence of paragraph 2c of the Severance Agreement states that BD paid Husband the Special Bonus "[a]s further consideration for [Husband's] agreement to the terms, releases and covenants not to sue set forth below." The second sentence states that Husband agrees "that the Special Bonus is in lieu of any right [Husband] may have or could ever have to receive the Performance Bonus." Neither Wife nor Husband point to any ambiguity in this language.

Focusing on the second sentence, Wife argues the Special Bonus was only consideration for Husband giving up his right to the Performance Bonus. Apparently recognizing that interpretation of a contract must give force and effect to every provision, Wife contends the reference in the first sentence to Husband's agreement not to sue was a "pre-existing condition precedent" to receiving the Performance Bonus, because according to the Performance Bonus Letter, if Husband was no longer employed by BD when the sales goal was achieved, he would need to sign a general release in order to receive the Performance Bonus payment. Wife's argument fails because even if Husband had to waive his right to sue in order to receive the Performance Bonus

---

[4] Wife and Husband agree that the de novo standard of review applies because no extrinsic evidence was presented and to the extent Husband's testimony regarding the circumstances surrounding the Severance Agreement constitutes extrinsic evidence, there was no conflict therein. Husband testified that he did not have any understanding that the Special Bonus consisted of the Performance Bonus and that his understanding was that the Special Bonus was for him releasing any further claims. While this tends to support Husband's proposed interpretation of the Severance Agreement, extrinsic evidence is not admissible to give a contract a meaning to which it is not reasonable susceptible. (*Trolan, supra*, 31 Cal.App.5th at p. 948.)

payment if and when the sales target was achieved, BD paid Husband the Special Bonus for an immediate release of any claims regardless of whether the sales target was ever achieved.  In other words, it would not have satisfied BD for Husband to give up his right to the Performance Bonus only, because then he could still sue.  Therefore, pursuant to the language of the Severance Agreement, part of the Special Bonus was consideration for Husband giving up his right to sue.

Husband does not argue that the Severance Agreement should be interpreted to mean that the Special Bonus was only consideration for giving up his right to sue and he does not address the express language stating that the Special Bonus is in lieu of his right to the Performance Bonus.  Instead, he contends that since he received the Special Bonus payment after separation, it is separate property and Wife has the burden to establish any community property component.  Husband recognizes that the most basic characterization factor is when the right to the payment accrued, not necessarily when the payment was received.  (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 735.)  Pension benefits, for example, are community property to the extent accrued during marriage, even if paid after separation.  (*In re Marriage of Frahm* (1996) 45 Cal.App.4th 536, 544-545 (*Frahm*) ["An employment benefit, whether or not vested, is community property to the extent a right to it accrues during marriage."].)  Husband does not dispute that the right to the Performance Bonus accrued during marriage.  In fact, he concedes that to the extent the Special Bonus was consideration for the Performance Bonus, that portion was community property.

Husband appears to argue that in order to show the Special Bonus was consideration for the Performance Bonus, Wife had the burden of proving a connection between "the value of the Performance Bonus (if any) and the

amount [Husband] ultimately received." Husband contends that the only evidence regarding the value of the Performance Bonus was his testimony that it was worth essentially zero, or speculative at best because no work was done toward achieving the sales target. According to Husband, there is no substantial evidence to support a factual finding that any amount of the Special Bonus can be attributable to the worthless Performance Bonus. He also argues that even if the sales target was achieved, it would have resulted from his postseparation labor. Therefore, any money received from the Performance Bonus would be his separate property. Husband's reasoning for why achieving the sales target would have necessarily resulted from his postseparation labor is convoluted, and we need not address it because the premise for both these arguments is flawed.

The Special Bonus was not an early payout of Husband's share of the potential future Performance Bonus payment. (Cf. *In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 752 [addressing appropriate method for determining the present value of pension benefits to be received in the future].) Rather, it was in exchange for Husband giving up *his right* to ever receive the Performance Bonus. Husband held the right to receive the Performance Bonus regardless of whether his labor contributed to achieving the sales target and regardless of whether or when the sales target was achieved. Additionally, BD paid Husband the Special Bonus for him to immediately give up that right, even if that right would have never resulted in a payment. (Cf. *In re Marriage of Andreen* (1978) 76 Cal.App.3d 667, 676 [court should not attempt to divide disability benefits that an active, nondisabled spouse may claim at some future time because court cannot predict if or when covered spouse will become disabled].)

Wife makes similarly flawed arguments regarding valuing the waiver of Husband's right to sue. She contends there was no substantial evidence to support a factual finding that the Special Bonus was consideration for Husband giving up his right to sue because there was no evidence that Husband had a viable claim. But BD was not paying to settle any specific claim. Instead, BD paid Husband the Special Bonus for him to immediately give up any right to sue, even if that right would have never resulted in any lawsuit. Wife also contends that even if Husband did have a viable claim, his right to sue BD would not be exclusively his separate property because 91 out of the 93 months he worked for BD was during marriage. However, the amount of time that Husband was employed during marriage is irrelevant where Husband's right to sue did not arise out of his employment but rather his termination. (See *In re Marriage of Steinberger* (2001) 91 Cal.App.4th 1449, 1459 [concluding severance payment acquired after separation was employee spouse's separate property because it "resulted not from a prior contractual obligation, but from the company's new decision to avoid potential litigation"]; *Frahm, supra*, 45 Cal.App.4th at p. 545, fn. 2 ["The time rule determines the amount of the community share. It does not determine the character of the benefit. Stated another way, a court first looks to see if the right to the payment accrued during marriage. If so, the time rule determines the extent of the community interest in the payment. But if the right to the payment did not derive from employment, it is separate property."].)

Finally, Wife argues that if this court affirms the trial court's interpretation of the Severance Agreement to mean that the Special Bonus was in exchange for Husband's right to a Performance Bonus as well as his right to sue, then remand is necessary to determine these relative values.

41

However, the court did determine that each right had an equal value when it allocated half of the Special Bonus as community property and half as Husband's separate property. Neither Wife nor Husband argued for a different valuation of each right.

As such, we affirm the court's ruling regarding the division of the Special Bonus.

D. Reimbursement to Community for Expenses Related to Wife's Separate Property

The court ordered Wife to reimburse the community for certain expenses related to her separate property pursuant to *In re Marriage of Frick* (1986) 181 Cal.App.3d 997 (*Frick*). Wife contends the court's reliance on *Frick* was misplaced and the court lacked authority to order the reimbursement under any other theory. We disagree and conclude the community was entitled to reimbursement for the type of expenses at issue.

1. Additional Facts

Wife had a separate property condominium in Vancouver, Canada. There is no dispute that between the date of marriage and when Wife sold the condominium on October 13, 2000, Wife used $8,501 of community funds to pay for "taxes, impound accounts, special assessments, repairs, selling and/or closing costs, or any other expense" associated with her Vancouver condominium. Wife also admitted using community funds to pay for "maintenance, special assessments and/or taxes" on the condominium.

Additionally, there is no dispute that between January 1, 2011 and November 2, 2019, Wife used another $1,055.42 of community funds to pay for "taxes in Canada on any investment accounts, present or past, containing funds [she] inherited from [her] mother and/or aunt, or containing proceeds from the sale of [her] condominium in Vancouver, Canada."

Wife conceded these expenses in her discovery responses and testified about the expenses.

### 2. Court's Ruling

The court granted Husband's request for reimbursement. Finding that Wife admitted using community funds of $8,501 and $1,055 to pay for her separate property expenses, the court ordered Wife to reimburse the community for both expenditures for a total of $9,556, pursuant to *Frick*.

### 3. Analysis

Wife concedes there is no factual dispute that she used $9,556 of community property to pay the subject separate property expenses. However, Wife argues *Frick* is inapplicable because that case addressed reimbursement of community funds used to improve one spouse's separate real property. (*Frick, supra*, 181 Cal.App.3d at pp. 1019-1020.) Wife argues that no portion of the $8,501 was used to improve the condominium or to pay down the mortgage on the condominium. Similarly, she contends the $1,055 payment was not related to real property but rather for taxes on investment accounts. Thus, according to Wife, *Frick* is not applicable to either reimbursement request. She also argues there is no other statutory or case authority for reimbursement of community funds used to pay separate property expenses of this nature. Wife is mistaken.

The court in *Frick* did indicate that the community was entitled to reimbursement for expenditure of community funds to improve separate property. (*Frick, supra*, 181 Cal.App.3d at pp. 1019-1020.) However, the right to reimbursement is not limited to improvements to separate property. The community is also entitled to reimbursement for community funds used to pay separate debts. (*Id.* at p. 1014.) This includes taxes, assessments, and incidental expenses related to separate real property. (*In re Marriage of*

43

*Walter* (1976) 57 Cal.App.3d 802, 806-807 [reimbursement for community funds used to pay taxes on separately owned real property], cited by *Frick*; *Somps v. Somps* (1967) 250 Cal.App.2d 328, 338 [reimbursement for community funds used to pay "taxes and incidental expenses" related to separate real property]; *In re Estate of Turner* (1939) 35 Cal.App.2d 576, 577, 580 [reimbursement for community funds used to pay "taxes and assessments"]; cf. *In re Marriage of Moore* (1980) 28 Cal.3d 366, 372 [community expenditures for interest and taxes must not be included when calculating the community's pro tanto *interest in* the separate property].) The right to community reimbursement also extends to community property used to pay taxes not related to real property. (*In re Marriage of Epstein* (1979) 24 Cal.3d 76, 89 [ordering reimbursement for community funds used to pay taxes on separate property income], cited by *Frick*.)

Here, Wife conceded using $8,501 of community funds to pay for "taxes, impound accounts, special assessments, repairs, selling and/or closing costs, or any other expense" as well as "maintenance, special assessments and/or taxes" associated with her separate property condominium in Vancouver. The community was entitled to reimbursement for these types of expenses related to her separate real property. The community was also entitled to reimbursement for the $1,055.42 of community funds that Wife conceded using to pay for taxes on investment accounts containing her separate property inheritance and proceeds from selling her separate property condominium.

As such, we affirm the court's ruling charging $9,556 of community property to Wife for these expenses.

## DISPOSITION

For the foregoing reasons, the judgment is modified to deny Husband's request for Family Code section 2640 reimbursement for the purchase of the La Jolla residence. The judgment is also modified to reflect the trial court's ruling that the Charles Schwab IRA is 41.9 percent Husband's separate property and 58.1 percent community property. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

KELETY, J.

WE CONCUR:

HUFFMAN, Acting P. J.

CASTILLO, J.